# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORDAN WYCKOFF, DARWIN COX, Individually and on Behalf of All Those Similarly Situated, | Case No. 1:15-cv-05186-PGG |

Hon. Paul G. Gardephe

**Plaintiffs,**

**CLASS ACTION**

v.

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as MAJOR LEAGUE BASEBALL; ALLAN H. SELIG; ROBERT D. MANFRED, JR.; KANSAS CITY ROYALS BASEBALL CORP.; MIAMI MARLINS, L.P.; SAN FRANCISCO BASEBALL ASSOCIATES LLC; BOSTON RED SOX BASEBALL CLUB L.P.; ANGELS BASEBALL LP; CHICAGO WHITE SOX LTD.; ST. LOUIS CARDINALS, LLC; COLORADO ROCKIES BASEBALL CLUB, LTD.; THE BASEBALL CLUB OF SEATTLE, LLLP; THE CINCINNATI REDS, LLC; HOUSTON BASEBALL PARTNERS LLC; ATHLETICS INVESTMENT GROUP, LLC; ROGERS BLUE JAYS BASEBALL PARTNERSHIP; CLEVELAND INDIANS BASEBALL CO., L.P.; CLEVELAND INDIANS BASEBALL CO., INC.; PADRES L.P.; SAN DIEGO PADRES BASEBALL CLUB, L.P.; MINNESOTA TWINS, LLC; WASHINGTON NATIONALS BASEBALL CLUB, LLC; DETROIT TIGERS, INC.; LOS ANGELES DODGERS LLC; LOS ANGELES DODGERS HOLDING COMPANY LLC; STERLING METS L.P.; ATLANTA NATIONAL LEAGUE BASEBALL CLUB, INC.; AZPB L.P.; BALTIMORE ORIOLES, INC.; BALTIMORE ORIOLES, L.P.; THE PHILLIES; PITTSBURGH ASSOCIATES, L.P.; NEW YORK YANKEES P'SHIP; TAMPA BAY RAYS BASEBALL LTD.; RANGERS BASEBALL EXPRESS, LLC; RANGERS BASEBALL, LLC; CHICAGO CUBS BASEBALL CLUB, LLC; MILWAUKEE BREWERS BASEBALL CLUB, INC.; MILWAUKEE BREWERS BASEBALL CLUB, L.P.,

**Defendants.**

1002319

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     ISSUES TO BE DECIDED ....................................................................................3

III.    RELEVANT ALLEGATIONS.................................................................................3

IV.     ARGUMENT ..........................................................................................................5

        A.      Plaintiffs' antitrust claims must be dismissed because the "business of baseball" is exempt from antitrust regulation. .......................................5

                1.      The Supreme Court and the Circuit Courts have always interpreted baseball's antitrust exemption broadly. .......................7

                2.      Congress has refused to subject employment disputes like this one to antitrust regulation. ............................................10

                3.      The allegations here—related to baseball player scouting—fall squarely within the scope of baseball's antitrust exemption. ...................12

                        a.      Plaintiffs cannot dodge the antitrust exemption by mischaracterizing the importance of scouting or the anti-tampering rule. ............................................................12

                        b.      Plaintiffs ignore binding case law and instead rely on distinguishable and unpersuasive district court opinions...............14

                4.      The antitrust exemption also bars Plaintiffs' state law antitrust claim under the Supremacy Clause and the Commerce Clause................17

        B.      Wyckoff's FLSA claims against all Clubs except the Kansas City Royals should be dismissed. .......................................................................19

                1.      Wyckoff lacks standing to assert FLSA claims against all 29 Clubs that never employed him...............................................19

                        a.      Wyckoff cannot bring FLSA claims against any Club other than the Royals..................................................................21

                        b.      The hypothetical claims of putative collective members cannot confer standing that Wyckoff lacks...................................23

                2.      Wyckoff fails to state legally cognizable FLSA claims against any Defendant Club other than the Kansas City Royals...................24

V.      CONCLUSION...........................................................................................................25

STATUTORY AND LEGISLATIVE ADDENDUM ..................................................................A1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*
190 F.3d 1051 (9th Cir. 1999) ...................................................13

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)...................................................................24

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)...................................................................23

*Charles O. Finley & Co. v. Kuhn*
569 F.2d 527 (7th Cir. 1978).................................................6, 7, 9

*City of San José v. Office of the Comm'r of Baseball*
--- S. Ct. ---, 2015 WL 1755762 (Oct. 5, 2015).......................1, 11

*City of San José v. Office of the Comm'r of Baseball*
776 F.3d 686 (9th Cir. 2015) ............................................ *passim*

*DiFolco v. MSNBC Cable L.L.C.*
622 F.3d 104 (2d Cir. 2010) ........................................................4

*Dziennik v. Sealift, Inc.*
No. 05-CV-4659 DLI MDG, 2006 WL 4586140 (E.D.N.Y. Aug. 30, 2006) ....................21, 22

*Fed. Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l Baseball Clubs*
259 U.S. 200 (1922)................................................................5, 8

*Flood v. Kuhn*
316 F. Supp. 271 (S.D.N.Y. 1970) .........................................8, 9, 17

*Flood v. Kuhn*
407 U.S. 258 (1972).......................................................... *passim*

*Flood v. Kuhn*
443 F.2d 264 (2d Cir. 1971) ........................................7, 9, 18, 19

*Garber v. Office of the Comm'r. of Baseball*
(No. 12-cv-3704 (SAS)), *decided sub nom Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280 (S.D.N.Y. 2014)....................................................17

*Henry v. Circus Circus Casinos, Inc.*
223 F.R.D. 541 (D. Nev. 2004) .................................................22

*In re Brand Name Prescription Drugs Antitrust Litig.*
   123 F.3d 599 (7th Cir. 1997) ......................................................................18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*
   27 F. Supp. 3d 447 (S.D.N.Y. 2014) ......................................................21, 22

*Kendall v. Employees Ret. Plan of Avon Prods.*
   561 F.3d 112 (2d Cir. 2009) ......................................................................23

*Lucas v. BMS Enters., Inc.*
   No. 3:09-CV-2159-D, 2010 WL 2671305 (N.D. Tex. July 1, 2010) .......................22

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992)..................................................................................21

*Mahon v. Ticor Title Ins. Co.*
   683 F.3d 59 (2d Cir. 2012) ...........................................................2, 20, 21, 22, 23

*Major League Baseball v. Crist*
   331 F.3d 1177 (11th Cir.) ......................................................................7, 18

*McCall v. Chesapeake Energy Corp.*
   817 F. Supp. 2d 307 (S.D.N.Y. 2011) ......................................................2, 20, 23

*Miranda v. Selig*
   No. 3:14-CV-5349 JCS, 2015 WL 5357854 (N.D. Cal. Sept. 14, 2015) ................13

*Morsani v. Major League Baseball*
   79 F. Supp. 2d 1331 (M.D. Fla. 1999)..........................................................11

*Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc.*
   No. 10 CIV. 2661 PAC, 2011 WL 321186 (S.D.N.Y. Jan. 28, 2011)......................24

*Portland Baseball Club, Inc. v. Baltimore Baseball Club, Inc.*
   282 F.2d 680 (9th Cir. 1960) ......................................................................7

*Portland Baseball Club, Inc. v. Kuhn*
   491 F.2d 1101 (9th Cir. 1974) ....................................................................7

*Postema v. Nat'l League of Prof'l Baseball Clubs*
   799 F. Supp. 1475 (S.D.N.Y. 1992) ......................................................14, 15, 16

*Prof'l Baseball Schs. & Clubs, Inc. v. Kuhn*
   693 F.2d 1085 (11th Cir. 1982) ....................................................................7

*Radovich v. Nat'l Football League*
   352 U.S. 445 (1957)................................................................................6, 7

*Robertson v. Nat'l Basketball Ass'n*
  389 F. Supp. 867 (S.D.N.Y. 1975) ........................................................................18

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*
  661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...................................................................18

*Salerno v. Am. League of Prof'l Baseball Clubs*
  429 F.2d 1003 (2d Cir. 1970) ..................................................................7, 9, 15, 16

*Salerno v. Kuhn*
  400 U.S. 1001 (1971) .............................................................................................16

*Senne v. Office of the Commissioner of Baseball.*
  No. 14-CV-00609-JCS, 2015 WL 4240716 (N.D. Cal. July 13, 2015).....................22

*Simon v. E. Kentucky Welfare Rights Org.*
  426 U.S. 26 (1976) .................................................................................................20

*Toolson v. N.Y. Yankees, Inc.*
  346 U.S. 356 (1953) .................................................................................... *passim*

*Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*
  832 F.2d 214 (1st Cir. 1987)....................................................................................7

*United States v. Int'l Boxing Club of N.Y.*
  348 U.S. 236 (1955).................................................................................................6

*United States v. Shubert*
  348 U.S. 222 (1955).....................................................................................6, 7, 16

*Yapuna v. Global Horizons Manpower, Inc.*
  245 F.R.D. 407 (E.D. Wash. 2008)........................................................................22

**State Cases**

*Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*
  18 N.Y.3d 722 (2012) ...........................................................................................18

*Partee v. San Diego Chargers Football Co.*
  34 Cal. 3d 378 (1983) ...........................................................................................19

*X.L.O. Concrete Corp. v. Rivergate Corp.*
  83 N.Y.2d 513 (1994) ...........................................................................................18

**Federal Statutes**

15 U.S.C. § 26b........................................................................................................10, 11

**Federal Rules**

Fed. R. Civ. P. 12(b)(1)..............................................................................................19, 20

Fed. R. Civ. P. 12(b)(6)..........................................................................................2, 19, 24

**Other Authorities**

Justice Samuel A. Alito, Jr., "The Origin of the Baseball Antitrust Exemption: *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*," 34 J. Sup. Ct. Hist. 183 (2009)......................................................................................6

I.     **INTRODUCTION**

Plaintiffs Jordan Wyckoff and Darwin Cox ("Plaintiffs") allege, on behalf of a putative class, federal- and state-antitrust claims targeting certain purported rules for the employment of scouts by Major League Baseball Clubs ("Clubs").  Plaintiff Wyckoff also alleges, on behalf of a putative collective, violations of the Fair Labor Standards Act ("FLSA") related to Defendants' purported wage-and-hour practices.  For the reasons explained below, all but one narrow piece of this action—Plaintiff Wyckoff's FLSA claims against Defendants Office of the Commissioner of Baseball, Allan H. Selig, Robert D. Manfred, and the Kansas City Royals Baseball Corp.—should be dismissed with prejudice.

The United States Supreme Court first declared the "business of baseball" exempt from antitrust regulation nearly a century ago, in 1922.  Since then, the Supreme Court and Circuit Courts have repeatedly and consistently enforced the exemption to dismiss a variety of antitrust claims.  Most recently, the Ninth Circuit held that the antitrust exemption "clearly extend[s] . . . to the entire business of providing public baseball games for profit between clubs of professional baseball players."  *City of San José v. Office of the Comm'r of Baseball*, 776 F.3d 686, 690 (9th Cir. 2015) (internal quotations omitted).  To put antitrust claims outside the exemption, a plaintiff must demonstrate that his antitrust claims target "activities that MLB and its franchises engage in that are ***wholly collateral to the public display of baseball games*.**"  *Id* (emphasis added).  Just a few months ago, the Supreme Court was invited to review the antitrust exemption and the Ninth Circuit's description of its scope, but the Court declined the opportunity to do so. *See City of San José v. Office of the Comm'r of Baseball*, --- S. Ct. ---, 2015 WL 1755762 (Oct. 5, 2015).

Plaintiffs Jordan Wyckoff and Darwin Cox do not seriously contest that their antitrust claims, targeting rules related to the employment of scouts, fall within the "business of baseball." Nor could they, given their allegations that scouts "evaluate baseball players' skills," report to Clubs "their assessments of players' skills and projections of the players' services," and assist

1

Clubs in "decid[ing] which players to pursue through free agency, the draft, and other player acquisition means."  Second Amend. Compl. ("SAC") (Dkt. 109) at ¶¶ 93–95.  Instead, Plaintiffs attempt to redefine the exemption's scope and carve out certain facets of the "business of baseball."  Plaintiffs' narrow reading of the exemption has no legal basis and ignores well-settled law from the Supreme Court and the Circuit Courts, including the Second Circuit.  Plaintiffs also ask this Court to ignore the Curt Flood Act, whereby Congress expressly left the antitrust exemption intact for several categories of conduct, including conduct related to employment practices in Major League Baseball.  Since Plaintiffs' antitrust claims fall squarely within baseball's antitrust exemption, this Court must dismiss them.

Only one Plaintiff in this case, Jordan Wyckoff, purports to assert wage-and-hour claims against the Defendants.  Because Wyckoff alleges that he was employed by only one Club, the Kansas City Royals, no wage injury can be attributed to any other Club.  Accordingly, under *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62–63 (2d Cir. 2012), Wyckoff lacks Article III standing to sue any of the other Clubs.  And although Wyckoff purports to assert claims on behalf of "similarly situated" members of a "collective," the fact that no named Plaintiff has standing so sue any other Club deprives this Court of subject matter jurisdiction.  *McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 315 (S.D.N.Y. 2011) *aff'd*, 509 F. App'x 62 (2d Cir. 2013).

Moreover, even if the Court found subject matter jurisdiction to exist in these circumstances, the FLSA claims against Clubs other than the Royals should be dismissed under Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6) because Wyckoff failed to allege plausible wage-and-hour claims against any Club other than the Royals.

## II.      ISSUES TO BE DECIDED

1.      Should this Court dismiss Plaintiffs' antitrust claims because the business of baseball is exempt from both state and federal antitrust regulation?

2.      Should this Court dismiss Wyckoff's FLSA claims against the 29 Clubs that he has admitted he never worked for because he lacks Article III standing?

3.      Should this Court dismiss Wyckoff's FLSA claims because he cannot state a claim for relief against entities that never employed him?

## III.     RELEVANT ALLEGATIONS

This is an antitrust and wage-and-hour case brought by two former baseball scouts.[1]  As alleged in the Second Amended Complaint, "Scouts evaluate baseball players' skills."  SAC at ¶ 93.  "They assess baseball players and project the players' abilities to perform at the major league level."  *Id.*  Scouts report their assessments and projections of players to the Clubs (*id.* at ¶ 94), and that information "allows" the Clubs "to decide which players to pursue through free agency, the draft, and other player acquisition means" (*id.* at ¶ 95).  A "scout who is good at evaluating baseball players has great value" because Clubs "place importance on the acquisition and development of baseball players."  *Id.* at ¶ 127.  According to the Complaint, MLB and its Clubs are "essentially the only employer of baseball scouts in the United States."  *Id.* at ¶ 125.

Plaintiff Darwin Cox alleges that he worked as a "Scouting Supervisor" for the Colorado Rockies from 1991 through 2011.  *Id.* at ¶ 159.  Each year, Cox and the Rockies signed a one-year contract that incorporated the Major League Rules.  *Id.*  "In December 2011, the Colorado Rockies did not renew Mr. Cox's contract."  *Id.*

Plaintiff Jordan Wyckoff alleges that he worked as a part-time scout for the Kansas City Royals from October 2012 to October 2013.  *Id.* at ¶¶ 145, 156.  Wyckoff's part-time contract allegedly entitled him to an annual salary of $15,000, which the Royals paid in semi-monthly

---

[1] Although Wyckoff and Cox both bring antitrust claims, only Wyckoff brings FLSA claims. *See* SAC at ¶ 74.

installments.  *Id.* at ¶ 147.  The Royals also paid Wyckoff a "monthly car allowance of $600," or $7,200 for the year.  *See* Gorman Decl., Ex. A ("Wyckoff Contract") at 4.[2]

Wyckoff, alone, purports to bring a cause of action under the FLSA against MLB, the Royals, and all 29 other Clubs (despite never having been employed by any Club other than the Royals).  *Id.* at ¶¶ 183–94.  In particular, Wyckoff alleges that the Royals and MLB failed to pay the applicable minimum or overtime wage for all of the hours that he worked (*id.*), and seeks to bring the same claims against 29 other Clubs—with whom he had no employment relationship— on behalf of a "similarly situated . . . MLB Scout Collective" (*id.* at ¶¶ 74–76).

Wyckoff, together with Cox, also alleges that MLB, the former and current Commissioners, and the 30 Clubs have conspired to decrease competition in the labor market for scouts in two ways.  *Id.* at ¶ 4.  First, Plaintiffs allege that Defendants agreed not to "poach" or "cold call" scouts for "lateral [employment] positions" while scouts are under contract with another Club, and relatedly, that they "agreed not to discuss employment opportunities with scouts employed" by other Clubs "without permission of the employing" Club.  *Id.* at ¶ 3. Plaintiffs point to Major League Rule 3(k), which states that if an interested Club wishes to negotiate employment terms with players, coaches, or managers while they are currently under contract with another Club, the interested Club must first obtain the permission of the employing Club.  *Id.*  All major professional sports have similar policies, and they are generally referred to as "anti-tampering rules."[3]  According to its own terms, the purpose of Rule 3(k) is to "preserve

---

[2] Plaintiffs incorporated Wyckoff's contract into their complaint by referencing and relying on it. SAC at ¶¶ 100–05, 107, 145, 147.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[3] *See* NBA Constitution at Art. 35A(e), *available at* http://mediacentral.nba.com/media/mediacentral/NBA-Constitution-and-By-Laws.pdf; NFL Anti-Tampering Policy, *available at* http://www.dawgtalkers.net/uploads/2009%20NFL%20Anti-Tampering%20Policy.pdf; "Blues will pay for tampering" (reporting that NHL commissioner stated that "Violations of the no-tampering provisions directly undermine the integrity of the league and the game."), *available at* http://hockeynut.com/9899/league0199.html.

discipline and competition, and to prevent . . . enticement." *Id.*  Plaintiffs assert that MLB and the Clubs apply Rule 3(k) to scouts. *Id.* at ¶ 117.

Second, Plaintiffs added a number of allegations to their Second Amended Complaint about a so-called "Offset Policy," but they do not allege that either of them was actually injured by it.  The "Offset Policy" is where the Clubs allegedly agreed to mitigate or offset compensation owed to scouts who are dismissed by one Club (while on a guaranteed contract) and then hired by another Club. *Id.* at ¶¶ 3; 108–13.  In other words, Plaintiffs allege that when scout contracts are guaranteed, they are guaranteed with a caveat.  If a terminated scout cannot obtain a new job, or obtains a new job outside of baseball, the scout is entitled to keep receiving his guaranteed salary.  But if the scout obtains a new job in baseball, the scout's new salary mitigates the obligation of the terminating Club.  Neither Plaintiff alleges that he was actually injured by this practice.  Indeed, they could not have been injured, because both Plaintiffs admit that they were not terminated and worked through the full term of their contracts (at which point their contracts expired); thus, according to their own allegations, Plaintiffs were never subject to the so-called "Offset Policy."[4] *Id.* at ¶¶ 156, 159, 163.

Based on these allegations, Wyckoff and Cox bring antitrust causes of action under the federal Sherman Act and New York's Donnelly Act.  Plaintiffs also seek to bring these claims on behalf of a proposed nationwide class of "salaried . . . scouts." *Id.* at ¶ 65.

## IV.   ARGUMENT

### A.   Plaintiffs' antitrust claims must be dismissed because the "business of baseball" is exempt from antitrust regulation.

In 1922, the Supreme Court held that the Clayton and Sherman Acts do not apply to the business of baseball. *Fed. Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200 (1922).  Justice Oliver Wendell Holmes, writing for a unanimous court,

---

[4] It would be doubly impossible for Wyckoff to claim injury from the Offset Policy because his contract also wasn't guaranteed.  Ex. A (Wyckoff Contract) at 2 ("This contract may be terminated at any time by Club . . . without further obligation or liability.").

concluded that baseball was not interstate commerce and therefore was not regulated by federal-antitrust law. *Id.* at 208. While the Supreme Court's Commerce Clause doctrine has changed over the last 92 years, and thus the underlying rationale for the exemption has changed, the broad scope of baseball's antitrust exemption has not.[5] Indeed, the Supreme Court has consistently reaffirmed that "the business of baseball" is beyond the scope of antitrust regulation. *Toolson v. N.Y. Yankees, Inc.*, 346 U.S. 356, 357 (1953) (per curiam); *Flood v. Kuhn*, 407 U.S. 258, 275 (1972). For the last sixty years, the Supreme Court has reaffirmed baseball's antitrust exemption based *not* on interstate commerce, but on stare decisis, baseball's reliance interests, and the Court's express deference to Congress. As the Seventh Circuit correctly noted, "[t]he Supreme Court has held three times that 'the business of baseball' is exempt from the federal antitrust laws." *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978). And each time, it is clear, "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws." *Id.*

Starting in 1953, the Supreme Court has consistently held that if the exemption is to be altered or curtailed, it is for Congress to do so.[6] And, in 1972, the Supreme Court recognized that Congress's deliberate decision not to repeal the exemption amounted to "something other than mere congressional silence and passivity," and instead constituted "positive inaction," reflecting that "Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." *Flood*, 407 U.S. at 283–85.

The relevant precedent demonstrates that Plaintiffs' claims in this case fall within the scope of the exemption.

---

[5] Justice Holmes's opinion was consistent with then-binding law on what did—and did not—constitute interstate commerce. Justice Samuel A. Alito, Jr., "The Origin of the Baseball Antitrust Exemption: *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*," 34 J. Sup. Ct. Hist. 183, 193 (2009).

[6] *Toolson*, 346 U.S. at 357; *see also Flood*, 407 U.S. at 283, 285; *Radovich v. Nat'l Football League*, 352 U.S. 445, 451 (1957); *United States v. Int'l Boxing Club of N.Y.*, 348 U.S. 236, 244 (1955); *United States v. Shubert*, 348 U.S. 222, 229–30 (1955).

### 1. The Supreme Court and the Circuit Courts have always interpreted baseball's antitrust exemption broadly.

The Supreme Court and the Circuit Courts have repeatedly held that the antitrust exemption applies to the entire "business of baseball."[7]  Although MLB and its partners may not have a blanket immunity—the exemption may not apply to claims that are "wholly collateral to the public display of baseball games" (*San José*, 776 F.3d at 690), or "to all cases which may have some attenuated relation to the business of baseball" (*Finley & Co.*, 569 F.2d at 541 n.51)—the antitrust exemption provides more than a narrowly circumscribed protection for "essential" facets of the business.

---

[7] Supreme Court: *Flood*, 407 U.S. at 285; *Radovich*, 352 U.S. at 451; *Shubert*, 348 U.S. at 228; *Toolson*, 346 U.S. at 357.

CA1: *Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 216 n.1 (1st Cir. 1987) (noting that baseball's antitrust exemption would exempt league decision on relocation of a Minor League club).

CA2: *Flood v. Kuhn*, 443 F.2d 264, 265 (2d Cir. 1971), *aff'd*, 407 U.S. 258 (1972) (exempting the "reserve system" embodied in league rules and in player-employment contracts)

CA2: *Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970), *cert. denied sub nom. Salerno v. Kuhn*, 400 U.S. 1001 (1971) (exempting MLB's employment relationship with umpires).

CA7: *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 541 (7th Cir.) (exempting the Commissioner's veto of a player "trade" involving players sent to another Club for cash), *cert. denied,* 439 U.S. 876 (1978).

CA9: *City of San José v. Office of the Comm'r of Baseball*, 776 F.3d 686, 689–90 (9th Cir.) (exempting MLB's process for deciding requests for franchise relocation), *cert. denied*, --- S. Ct. ---, 2015 WL 1755762 (Oct. 5, 2015).

CA9: *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101, 1103 (9th Cir. 1974) (per curiam) (exempting MLB's decision to locate Major League Club in Minor League territory).

CA9: *Portland Baseball Club, Inc. v. Baltimore Baseball Club, Inc.*, 282 F.2d 680 (9th Cir. 1960) (exempting "professional baseball" from antitrust claims brought by a Minor League club).

CA11: *Major League Baseball v. Crist*, 331 F.3d 1177, 1183 (11th Cir.) (exempting MLB's process for "contraction" of league and elimination of Club), *pet. for reh'g denied*, 82 F. App'x 224 (11th Cir. 2003).

CA11: *Prof'l Baseball Schs. & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1085–86 (11th Cir. 1982) (exempting minor league "franchise location system").

At the Supreme Court, various petitioners have tried to challenge a wide array of baseball's business practices, but the Court has rejected **all** of those challenges, no matter what aspect of the "business of baseball" was targeted.  For example, in *Federal Baseball*, the petitioner claimed that baseball "conspired to monopolize the base ball business" and had "destroyed the Federal League by buying up some of the constituent clubs."  *Fed. Baseball*, 259 U.S. at 207.  The Court dismissed those claims categorically.  Indeed, the Court declared that it was "unnecessary" to even "repeat" the various "means" employed by defendants to achieve their alleged monopolization.  *Id.*

Next, in *Toolson*, petitioners challenged a number of different league rules, including restrictions on: territories for Major and Minor League clubs, changes to those territories (which required a vote of the Clubs), broadcast and telecast rights by geographic territory, club debt, exhibition games with banned players, uniform player contracts, and the reserve clause in those uniform contracts.  Petitioner's Brief, *Toolson*, 346 U.S. 356 (No. 18), 1953 WL 78316, at *5–9 (Sept. 16, 1953).  The petitioner in *Toolson* also challenged a restriction just like the one that Wyckoff challenges here, a rule that "no club shall negotiate with a player under contract with, or on the reserve list of, another club without the latter club's express consent."  Respondents' Brief, *Toolson*, 346 U.S. 356 (No. 18), 1953 WL 78318, at *3 (Oct. 2, 1953).  The Court rejected all of those challenges—including the challenge to baseball's anti-tampering rule—stating simply that "Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."  *Toolson*, 346 U.S. at 357.

And more recently in *Flood*, the petitioner focused his challenge on the "reserve system," including the reserve clause located in player-employment contracts.  Petitioner's Brief, *Flood*, 407 U.S. 258 (No. 71-32), 1971 WL 133753, at *4 (Dec. 17, 1971).  Again, the petitioner's antitrust claims included allegations directly targeting MLB's anti-tampering rules.  *Id.* at *6; *Flood v. Kuhn*, 316 F. Supp. 271, 274 n.5 & associated text (S.D.N.Y. 1970) (quoting the anti-tampering rule).  And again, the Supreme Court rejected the claims as falling squarely within the antitrust exemption for the "business of baseball."  *Flood*, 407 U.S. at 285.

The Circuit Courts have also held that the antitrust exemption encompasses the full business of baseball.  *See*, *supra*, note 7 (summarizing cases).  As the Seventh Circuit has described it, "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws."  *Finley & Co.*, 569 F.2d at 541.  Courts have repeatedly rebuffed attempts by plaintiffs to impose a more exacting or stringent test.  For example, the Second Circuit has applied the exemption to bar employment-related antitrust claims brought by umpires who alleged that they were fired in retaliation for trying to organize a union, and claimed that this restraint of trade was somehow related to MLB's monopolization of baseball.  *Salerno*, 429 F.2d at 1004–05.  The Second Circuit has also barred employment-related antitrust claims brought by a player challenging MLB's "reserve system."  *Flood*, 443 F.2d 264, 265 (2d Cir. 1971).  Notably, that player specifically challenged MLB's anti-tampering rule.[8] Hence binding circuit law has directly rejected Plaintiffs attempt to somehow push employment-related claims outside the "business of baseball."

For another example, earlier this year the Ninth Circuit considered the argument that baseball's antitrust exemption applies only if challenged activity is "sufficiently related to 'baseball's unique characteristics and needs.'"  *San José*, 776 F.3d at 689.  The court definitively rejected this argument, and instead held that the antitrust exemption "clearly extend[s] . . . to the entire 'business of providing public baseball games for profit between clubs of professional baseball players."  *Id.* at 690 (quoting *Toolson*, 346 U.S. at 357).  "That doesn't necessarily mean that all antitrust suits that touch on the baseball industry are barred."  *San José*, 776 F.3d at 690.  After all, there "might be activities that MLB and its franchises engage in that are ***wholly collateral to the public display of baseball games***, and for which antitrust liability may therefore attach."  *Id* (emphasis added).

---

[8] *See* Petitioner's Brief, *Flood*, 407 U.S. 258 (No. 71-32), 1971 WL 133753, at *6; *Flood*, 316 F. Supp. at 274 n.5 & associated text (quoting the anti-tampering rule).

But despite the possibility that some future case may involve a "wholly collateral" activity, this is not that case. Every Circuit Court to consider the antitrust exemption has found that a broad array of business activities fall within its scope. *See*, *supra*, note 7.

### 2. Congress has refused to subject employment disputes like this one to antitrust regulation.

The Supreme Court has consistently held that—if the antitrust exemption is to be altered or repealed—it must be done by Congress, not the Court. *Flood*, 407 U.S. at 284. Congress, heeding the call, has repeatedly considered legislation to address the existence and scope of professional baseball's antitrust exemption.[9] Congress has refused to subject all but one aspect of the business of baseball to antitrust regulation.

In 1998, Congress enacted the Curt Flood Act (codified at 15 U.S.C. § 26b), which provided Major League players, for the first time, with antitrust recourse for injuries related to their employment. 15 U.S.C. § 26b(a). Congress explicitly declined to alter the exemption for any other aspect of the business of baseball. 15 U.S.C. § 26b(b) (mandating that "[n]o court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws").

Congress also explicitly identified several business areas where antitrust law and the antitrust exemption were to remain the same. At least two of those areas cover Plaintiffs' claims here. First, Congress carved out "any conduct, acts, practices, or agreements of persons engaging in . . . the business of organized professional baseball relating to or affecting employment to play baseball at the minor league level [or] any organized professional baseball amateur or first-year draft." 15 U.S.C. § 26(b)(1). Second, Congress carved out "the

---

[9] The Supreme Court in *Flood* found it particularly relevant that, in the 19 years between *Toolson* and *Flood*, "more than 50 bills [were] introduced in Congress relative to the applicability or nonapplicability of the antitrust laws to baseball." *Flood*, 407 U.S. at 281. Similarly, from 1972 to 2014, Congress held **45 hearings** related to the business of baseball, most of which raised questions about baseball's antitrust exemption. *See* Statutory and Legislative Addendum at page A5–A8.

relationship between persons in the business of organized professional baseball and umpires or other individuals who are employed in the business of organized professional baseball by such persons."  15 U.S.C. § 26b(b)(5).  Plaintiffs cannot claim that these carve outs do not apply to their claims.  Scouting obviously relates to Minor League employment and the draft.  And scouts are obviously "employed in the business of organized professional baseball."  *Id*.  Plaintiffs may wish to interpret these carve outs parsimoniously, but Congress actually mandated that they "shall not be strictly or narrowly construed."  15 U.S.C. § 26b(d)(5).

Congress explicitly chose which specific aspects of baseball would become subject to the antitrust laws, and thereby confirmed that it did not intend for the antitrust laws to apply to anything other than claims by MLB players arising from employment disputes.  *See Morsani v. Major League Baseball*, 79 F. Supp. 2d 1331, 1335 n.12 (M.D. Fla. 1999).  Consequently, the Curt Flood Act left baseball's antitrust exemption intact for the rest of the business of baseball, including challenges related to or affecting Minor League employment; the draft; or the "relationship" between MLB, the Clubs, and "individuals who are employed in the business of organized professional baseball" (a group that certainly includes scouts).  15 U.S.C. § 26b(b)(1) & (5).

In *City of San José*, where the Ninth Circuit concluded that Congress preserved the antitrust exemption for franchise relocation, the court reasoned that "when Congress specifically legislates in a field and explicitly exempts an issue from that legislation, our ability to infer congressional intent to leave that issue undisturbed is at its apex."  773 F.3d at 691.  "The exclusion of franchise relocation from the Curt Flood Act demonstrates that Congress (1) was aware of the possibility that the baseball exemption could apply to franchise relocation; (2) declined to alter the status quo with respect to relocation; and (3) had sufficient will to overturn the exemption in other areas."  *Id*.  The statutory franchise-relocation exclusion is located in the same section of the Curt Flood Act as the exclusions for the Minor Leagues, the draft, and "employment."  As the Ninth Circuit's reasoning confirms, the Curt Flood Act was deliberately designed to preserve an exemption for the sort of labor claims that Plaintiffs assert here.

11

3. **The allegations here—related to baseball player scouting—fall squarely within the scope of baseball's antitrust exemption.**

a. **Plaintiffs cannot dodge the antitrust exemption by mischaracterizing the importance of scouting or the anti-tampering rule.**

Plaintiffs' employment-related claims do not fall outside the scope of the "business of baseball." Although the Second Amended Complaint includes new allegations that attempt to minimize the importance of scouting (*see* SAC at ¶¶ 95–96), the Plaintiffs have already admitted that, up and down the scouting ranks, scouts provide critical services that go to the heart of the game itself.[10]

- Amateur scouts evaluate and project potential Major League players, and then their scouting reports "allow" the Clubs "to decide which players to pursue through free agency, the draft," or "other player acquisition means." *Id.* at ¶ 95.

- Cross-checkers compare the top draft candidates in each area and coordinate with scouting directors to develop a Club's drafting strategy. They're the scouts who help Clubs "rank players to be acquired." *Id.*

- Then, after draftees enter a Club's Minor League system and become "prospects," the professional scouts step in to evaluate their professional development and potential for advancement. These professional scouts also evaluate prospects on other Clubs' rosters for player trades or free-agent signings. *Id.* at ¶¶ 93, 95.

A scout's core function is to "assess baseball players and project the players' abilities to perform at the major league level." *Id.* at 93. As Plaintiffs admit, a "scout who is good at evaluating baseball players has great value" to professional baseball Clubs. *Id.* at ¶ 127.

Implicitly recognizing a scout's central role in "the business of baseball," Plaintiffs try to redefine the scope of the exemption to cover something narrower than either the courts or Congress have established. The Court should reject Plaintiffs' baseless attempt to avoid binding authority. First, Plaintiffs mistakenly assume that they can put a "facet" of the business of

---

[10] Plaintiffs' attempt to minimize the importance of scouting is also contradicted by their personal statements. For example, the Complaint alleges that "scouts do not sign players," but Plaintiff Darwin Cox elsewhere boasts about the various awards that he has received for "signing Major League player[s]." "Dar Cox" LinkedIn Profile, *available at* https://www.linkedin.com/pub/dar-cox/3/b28/378 (visited Oct. 23, 2015).

baseball outside the exemption by pleading that it is not "essential to staging professional baseball games" and that it does not "enhance the vitality and viability of baseball." SAC at ¶ 123. What those phrases mean is a mystery. And neither the Supreme Court nor any Circuit Court has applied anything like this incomprehensible test. Rather, as explained above in Section IV.A.1, the Supreme Court and the Circuit Courts have universally held that the exemption covers the entire business of baseball. In fact, the Ninth Circuit just rejected the exact same argument that Plaintiffs make here. As Judge Kozinski explained, a district court does *not* need to examine whether some business practice is "sufficiently related to 'baseball's unique characteristics and needs.'" *San José*, 776 F.3d at 689 (quoting *Flood*, 407 U.S. at 282). Instead, the appropriate test is simply whether the challenge "relate[s] to the 'business of providing public baseball games for profit between clubs of professional baseball players.'" *San José*, 776 F.3d at 690; *Miranda v. Selig*, No. 3:14-CV-5349 JCS, 2015 WL 5357854, at *2 (N.D. Cal. Sept. 14, 2015). Courts are not supposed to engage in "some fact-sensitive analysis of the role" that the challenged-business practice "play[s] within the baseball industry." *San José*, 776 F.3d at 690. Accordingly, this Court should reject Plaintiffs' attempt to impose a vague "essentiality" test that has been uniformly rejected by the Supreme Court and the Circuit Courts.

Second, Plaintiffs mistakenly assume that they can separate the specific rule that they are challenging—the anti-tampering rule—from the broader context of their claim, which is the employment relationship between scouts and Clubs.[11] SAC at ¶ 123. Plaintiffs have distorted the nature of their claims because they do not seriously question that scouts and scouting are critical to the "business of providing public baseball games for profit between clubs of professional baseball players." *Toolson*, 346 U.S. at 357. Indeed, Plaintiffs cannot claim that scouts (and their employment agreements) are outside the business of baseball after conceding

---

[11] Again, neither Plaintiff has standing to claim injury from the so-called Offset Policy because neither could possibly have been injured by it. *See*, *supra*, Section III. *See also Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999). Defendants can more fully brief Plaintiffs' failure to plead antitrust injury and standing if the Court deems it necessary.

that the **only** employers for their scouting services are these Defendants: the Clubs and the league office.  SAC at ¶ 125.  If scouts are engaged in something else beyond the "business of baseball," the Second Amended Complaint contains no suggestion of what that could be.

Even if the Plaintiffs' mistaken assumption were correct and the anti-tampering rule could be separated from the broader context of the employment relationship between scouts and Clubs, Plaintiffs' argument still fails.  The anti-tampering rule is designed to "preserve discipline and competition, and to prevent . . . enticement."  SAC at ¶ 116.  Baseball, like all professional sports, has adopted many prophylactic rules to maintain the integrity of competition, and to prevent anyone from even questioning the fairness of the game.  For example, baseball has reasonably decided that umpires must be—and must appear to be—completely independent of the Clubs, so umpires cannot accept gifts or even discuss job offers with Clubs.[12]  Like these other rules, the anti-tampering rule is designed to ensure the fairness of competition.  Rules that are directed at the integrity of the game are part of the "business of baseball," and therefore they fall under the antitrust exemption.

> **b.** **Plaintiffs ignore binding case law and instead rely on distinguishable and unpersuasive district court opinions.**

Against the great weight of binding and persuasive authority, Plaintiffs have cited two easily distinguishable district court cases.  *See* Plaintiff's Pre-Motion Letter, Dkt. 105 at 2.  First, Plaintiffs point to a 1992 decision in which District Judge Patterson held that baseball's antitrust exemption did not bar a common-law restraint-of-trade claim brought by a female umpire (who alleged gender-based discrimination).  *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F.

---

[12] MLR 21(c), Dkt. 109-1 at 91.

14

Supp. 1475, 1489 (S.D.N.Y. 1992), *rev'd on other grounds*, 998 F.2d 60 (2d Cir. 1993).[13]  The *Postema* opinion provides no guidance here.  First, as Judge Patterson admitted in *Postema*, the Second Circuit had previously held that the exemption **barred** umpires from bringing antitrust claims against MLB.  799 F. Supp. at 1489 (citing *Salerno*, 429 F.2d at 1004–05).  Second, *Postema*'s attempt to distinguish binding Second Circuit precedent interpreted *Flood* as having narrowed the antitrust exemption, but the Supreme Court actually reaffirmed the exemption in full.  As Judge Kozinski recently explained for the Ninth Circuit, "*Flood*'s stare decisis and congressional acquiescence rationales suggest the [Supreme] Court intended the exemption to have the same scope as the exemption established in *Federal Baseball* and *Toolson*."  *San José*, 776 F.3d at 690.  Any contrary suggestion "would make little sense."  *Id*.  Indeed, the Supreme Court's holding in *Flood* is a block quotation from *Toolson*, which in turn affirmed *Federal Baseball* "so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."  *Flood*, 407 U.S. at 285 (quoting *Toolson*, 346 U.S. at 357).  The court in *Postema* interpreted *Flood* as having somehow limited the scope of the antitrust exemption to baseball's "unique characteristics and needs" but, in fact, the Supreme Court reaffirmed (and quoted) its prior holding in full.  *Compare* 799 F. Supp. at 1489 (quoting *Flood*, 407 U.S. at 282) *with Flood*, 407 U.S. at 285 (quoting *Toolson*, 346 U.S. at 357).  The *Postema* opinion fixed on stray language as to "baseball's unique characteristics and needs" that, in context, merely says that baseball has reliance and stare-decisis interests that no other sport or industry can claim; that is what makes baseball "unique."  *Flood*, 407 U.S. at 282 (referring to baseball's "unique characteristics and needs" in paragraph

---

[13] Specifically, the plaintiff alleged three claims: (1) a Title VII claim of sex discrimination, (2) a sex-discrimination claim under New York State's Human Rights Law, and (3) "the common law tort of unreasonable restraint of trade as a result of the defendants' concerted efforts to prevent plaintiff, or any other woman, from becoming a major league umpire."  Plaintiff's Memorandum in Opposition to Motion to Dismiss or for Summary Judgment, 91-cv-8507 (KC), Dkt. 16, at 3 (Mar. 27, 1992).  The antitrust exemption was raised as a defense only to the restraint-of-trade claim.

that discusses stare decisis); *see also Shubert*, 348 U.S. at 222 (referring to the judicial and congressional history of the exemption as creating a "unique combination of circumstances").

Earlier this year, the Ninth Circuit rejected the core of *Postema*'s holding, based as it is on "isolated language" that (1) is "derived from a single sentence," and (2) was not meant to describe the scope of the antitrust exemption. *City of San José*, 776 F.3d at 689–90. Based on this "isolated language," the *Postema* court held that the "baseball exemption does not encompass umpire employment relations," even though—as the opinion admits—the Second Circuit had previously held the opposite, that the antitrust exemption ***did*** bar umpire-related employment claims. 799 F. Supp. at 1489 (citing *Salerno*, 429 F.2d at 1004–05). The Supreme Court's *Flood* opinion actually cites *Salerno*—without criticism. *See Flood*, 407 U.S. at 272 n.12. If the Supreme Court had any disagreement with *Salerno*—despite denying a petition for certiorari in *Salerno* just one year earlier[14]—it would have said as much in its opinion. Ultimately, the *Postema* decision is inconsistent with binding authority from both the Second Circuit and the Supreme Court.

Although MLB believes *Postema* was wrongly decided, this Court does not need to reach that holding, as the decisions of another district court judge are not binding on this Court. Moreover, the *Postema* decision is distinguishable on at least two grounds. *First*, *Postema* was decided in 1992, six years before Congress passed the Curt Flood Act. In 1998, Congress deliberately preserved the exemption for disputes relating to minor league employment; the draft; and the employment "relationship" between MLB, the Clubs, and "individuals who are employed in the business of organized professional baseball." 15 U.S.C. § 26b(b)(1) & (5). Judge Patterson did not have the benefit of Congress's guidance when he decided *Postema*. *Second*, the factual allegations in *Postema* are distinguishable. The core of *Postema*'s holding is that gender-based discrimination is not important enough to the business of baseball to fall within the exemption. But Plaintiffs' allegations here focus on scouts (who are central to the

---

[14] *See Salerno v. Kuhn*, 400 U.S. 1001 (1971).

draft and acquisition of professional baseball players) and on baseball's anti-tampering policy (a prophylactic rule that protects the integrity of fair competition).  *See*, *supra*, Section IV.A.3.a. Any interpretation of the "business of baseball" that does not encompass such allegations would be unjustifiably narrow.  So even if this Court were to apply *Postema*'s vague "central enough" test, Plaintiffs' claims must be dismissed.

Plaintiffs also point to a recent decision in which District Judge Scheindlin held that baseball's antitrust exemption did not encompass MLB's system for licensing some broadcasting rights by geographic territory.  *See Garber v. Office of the Comm'r. of Baseball* (No. 12-cv-3704 (SAS)), *decided sub nom Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 295–97 (S.D.N.Y. 2014).  Judge Scheindlin's opinion primarily relied on the fact that Congress had enacted a separate statutory antitrust exemption for "sports broadcasting agreements" in 1961. *Id.* at 295.  According to Judge Scheindlin's interpretation, the "language and structure" of this statute "suggest[ed]" that "Congress understood sports broadcasting agreements to fall *outside* the baseball exemption" and "Congress's understanding of the scope of the baseball exemption" is "highly persuasive."  *Id.* at 293, 295 (emphasis in original).  MLB and the Clubs disagree with Judge Scheindlin's ruling and plan to appeal if final judgment is entered against them.  In any event, Judge Scheindlin's ruling narrowly applies to geographic-broadcasting restrictions and not the employment of scouts.  The statutes that apply to broadcasting and employment are completely different; indeed, the Curt Flood Act demonstrates specifically that Congress did not intend to subject baseball's employment issues to antitrust regulation.  So even if Judge Scheindlin's reasoning—based on inferred congressional intent—was applied to this case, then Wyckoff's claim must be dismissed.

### 4.    The antitrust exemption also bars Plaintiffs' state law antitrust claim under the Supremacy Clause and the Commerce Clause.

Plaintiffs also attempt to impose antitrust regulation on MLB and the Clubs by asserting state-law antitrust claims under the Donnelly Act, but those claims cannot stand for two independent constitutional reasons.

*First*, the Supreme Court held in *Flood* that federal policy embodied in the antitrust exemption preempts state antitrust regulation of baseball.  As the Court explained, "state antitrust regulation would conflict with federal policy and . . . national 'uniformity (is required) in any regulation of baseball.'"  407 U.S. at 284 (quoting *Flood*, 316 F. Supp. at 280).  The Supremacy Clause of the Constitution flatly prohibits this type of inconsistent regulation.  *See* U.S. Const. Art. VI, cl. 2, and on that basis, the *Flood* Court affirmed the dismissal of state law claims.  Thus, baseball is an exception to the normal rule that "federal antitrust laws [ ] supplement, not displace, state antitrust remedies."  *City of San José*, 776 F.3d at 691 (citation omitted); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 611 (7th Cir. 1997) (Posner, J.) (observing that federal antitrust law uniquely preempts state antitrust law for baseball).  Baseball is *not* an area where "Congress has refrained from federal antitrust regulation," and thereby left the states "free reign to apply their antitrust laws."  *Crist*, 331 F.3d at 1184.  Instead, "federal law establishes a universal"—meaning national—"exemption in the name of uniformity."  *Id*. at 1186.  As the district court held in *Flood*, baseball's "nationwide character" and the "interdependence" of MLB's Clubs require a "uniformity" of regulation.  316 F. Supp. at 279–80, *aff'd*, 443 F.2d 264 (2d Cir. 1971).  Plaintiffs therefore cannot use state law to impose antitrust liability on MLB and the Clubs.  Plaintiffs' Donnelly Act claim is preempted by federal law and must be dismissed.[15]

*Second*, Wyckoff's attempt to conduct antitrust regulation under the guise of state law is *also* prohibited by the Commerce Clause.  *See Flood*, 407 U.S. at 284–85 (holding that, in

---

[15] The Donnelly Act claim must be dismissed as a matter of state law, too.  "The Donnelly Act was patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act."  *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 233 (E.D.N.Y. 2009).  In fact, the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994) (citation omitted).  *See also Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (2012) (refusing to apply the Donnelly Act "where the analogue federal claim would be barred by congressional enactment").

addition to being preempted, state-law antitrust claims create an undue burden on interstate commerce). The Commerce Clause prohibits the application of state antitrust laws not only in baseball, which has a unique antitrust exemption, but also in other professional sports. For example, this Court held that the Second Circuit's opinion in *Flood* was "controlling" and that the Commerce Clause barred Donnelly Act claims against the NBA. *Robertson v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 880–81 & 880 n.22 (S.D.N.Y. 1975). Similarly, the California Supreme Court has reasoned that professional sports leagues need a "nationally uniform set of rules governing the league structure," to avoid "[f]ragmentation" and "differing state antitrust decisions." *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 384–85 (1983). Therefore, it held that California's analogue to the Donnelly Act cannot be used against professional football. *Id*. at 385. And, of course, the Second Circuit has held that MLB cannot be forced to submit to varying state law regulation because the "burden on interstate commerce outweighs the states' interests." *Flood*, 443 F.2d at 267–68.

*     *     *

Plaintiffs cannot plausibly assert that scouts in general (or these restrictions in particular) are somehow so peripheral to the business of baseball that this case must fall outside of the antitrust exemption. The Court should dismiss Plaintiffs' federal and state antitrust claims for failing to state a claim for relief.

**B.    Wyckoff's FLSA claims against all Clubs except the Kansas City Royals should be dismissed.**

Wyckoff brings FLSA claims against all 30 Clubs. However, because Wyckoff fails to allege employment relationships with any Clubs other than the Royals, those claims must be dismissed pursuant to Federal Rule 12(b)(1) for lack of standing, and for the additional reason that he fails to state a claim pursuant to Federal Rule 12(b)(6).

**1.    Wyckoff lacks standing to assert FLSA claims against all 29 Clubs that never employed him.**

Wyckoff lacks standing to assert FLSA claims against entities that never employed

19

him.[16]  Although Wyckoff purports to assert claims against all Clubs, it is clear on the face of the Second Amended Complaint that he did not have an employment relationship with any Club other than the Royals.[17]   It is black letter law that in order for this Court to have subject matter jurisdiction over these FLSA claims, Wyckoff must establish that he has been employed, and ultimately injured, by *each* Defendant.  *See*, *e.g.*, *Mahon*, 683 F.3d at 62–63 (finding that it would be "unprecedented" and impermissible to allow a plaintiff to bring a claim against a defendant who did not personally injure that plaintiff).  Thus, because Wyckoff alleges that he was employed and injured only by the Royals, the FLSA claims against the other 29 Clubs must be dismissed for lack of subject matter jurisdiction.[18]  Fed. R. Civ. P. 12(b)(1).  The mere fact that Wyckoff styled his claims as a collective action, and that he purports to assert claims on behalf of other supposedly similarly situated individuals, does not cure the fatal standing defects; a named plaintiff must allege and show that he personally has been injured, not that injury has been suffered by other, unidentified members of the putative class to which he might belong and which he purports to represent.  *McCall*, 817 F. Supp. 2d at 315.

---

[16] Only Wyckoff purports to bring claims under the FLSA in this matter. *See* SAC at ¶ 74.

[17] *See* SAC at ¶ 18.  Wyckoff also alleges that he was jointly employed by MLB.  *See*, *e.g.*, SAC at ¶ 22.  While Defendants deny that allegation, the present motion addresses Wyckoff's standing to bring FLSA claims against the Clubs.

[18] The FLSA claims against the following Clubs should be dismissed as a matter of law: AZPB L.P., Atlanta National League Baseball Club, Inc., Baltimore Orioles, Inc. and Baltimore Orioles, L.P., Boston Red Sox Baseball Club L.P., Chicago Cubs Baseball Club, LLC, Chicago White Sox Ltd., The Cincinnati Reds LLC, Cleveland Indians Baseball Co., L.P. and Cleveland Indians Baseball Co., Inc., Colorado Rockies Baseball Club, Ltd., Detroit Tigers, Inc., Houston Baseball Partners LLC, Angels Baseball LP, Los Angeles Dodgers LLC and Los Angeles Dodgers Holding Company LLC, Miami Marlins, L.P., Milwaukee Brewers Baseball Club, Inc. and Milwaukee Brewers Baseball Club, L.P., Minnesota Twins, LLC, Sterling Mets, L.P., New York Yankees Partnership, Athletics Investment Group LLC, The Phillies, Pittsburgh Associates, L.P., Padres L.P. and San Diego Padres Baseball Club, L.P., San Francisco Baseball Associates LLC, The Baseball Club of Seattle, LLLP, St. Louis Cardinals, LLC, Tampa Bay Rays Baseball Ltd., Rangers Baseball Express, LLC and Rangers Baseball, LLC, Rogers Blue Jays Baseball Partnership and Washington Nationals Baseball Club, LLC.

### a.   Wyckoff cannot bring FLSA claims against any Club other than the Royals.

As the Supreme Court has firmly established, "[n]o principle is more fundamental . . . than the constitutional limitation of federal-court jurisdiction to actual cases or controversies . . . [and] [t]he concept of standing is part of this limitation." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 37 (1976). Accordingly, standing is to be considered "a threshold question in every federal case." *Mahon*, 683 F.3d at 62 (holding that when a plaintiff lacks Article III standing, a court has no subject matter jurisdiction to hear the claim, and that claim must be dismissed). *See also Dziennik v. Sealift, Inc.*, No. 05-CV-4659 DLI MDG, 2006 WL 4586140, at *2 (E.D.N.Y. Aug. 30, 2006) (describing standing as "a threshold matter").

As the party invoking federal jurisdiction, Wyckoff bears the burden of establishing standing with respect to the FLSA claims against ***each*** Defendant. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In other words, a plaintiff must sufficiently plead facts to show that the defendants' allegedly unlawful conduct "caused injury to the plaintiff [him]self." *Id.*; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481 (S.D.N.Y. 2014).

Where a plaintiff brings claims against multiple defendants, that plaintiff must be able to assert a claim of injury directly against *each* of those defendants. In *Mahon*, for instance, a plaintiff brought a class action against two defendants for contract claims related to insurance coverage. 683 F.3d at 61. The plaintiff, who had no personal dealings with one of the two defendants, argued that because she had properly alleged standing with regard to one defendant, Article III did not prevent her from suing "non-injurious" defendants in the same suit on behalf of a class. *Id.* The Court of Appeals disagreed: "[n]o decision that we can discern has ever adopted such a broad interpretation of constitutional standing." *Id.* at 62–63. Because the Court determined that there was no reason "a plaintiff's injury resulting from the conduct of one defendant should have any bearing on her Article III standing to sue other defendants, even if they are engaged in similar conduct that injured other parties," the Court affirmed the dismissal

of claims for lack of standing. *Id.* at 65; *see also In re LIBOR*, 27 F. Supp. at 481–82 (dismissing claims in purported class antitrust litigation against defendants with whom the named plaintiffs had not contracted, because "named plaintiffs lack standing to sue each of the named defendants 'in their own right' under Article III"); *Dziennik*, 2006 WL 4586140, at *3 (dismissing claims in class action for lack of standing where plaintiffs failed to allege that they personally had ever worked for four of the defendants).

Standing requirements apply with equal force in the wage-and-hour context. Courts in other jurisdictions have examined this issue and have routinely held that in order to establish Article III standing in a wage-and-hour case, a plaintiff alleging FLSA violations must establish that he had an employment relationship with *each* defendant. *See, e.g., Lucas v. BMS Enters., Inc.*, No. 3:09-CV-2159-D, 2010 WL 2671305, at *3 (N.D. Tex. July 1, 2010) (dismissing FLSA claims against defendants who did not employ plaintiffs); *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 543-44 (D. Nev. 2004) (dismissing claims in FLSA suit against defendants who did not employ plaintiffs because "at least one named plaintiff must have standing in his own right to assert a claim against *each* named defendant) (emphasis added); *Yapuna v. Global Horizons Manpower, Inc.* , 245 F.R.D. 407, 412 (E.D. Wash. 2008) (summarily dismissing FLSA claims for lack of standing where the representative plaintiff failed to allege that he worked for one of the defendants).

Because Wyckoff alleges to have been employed by only the Royals, he lacks Article III standing to assert FLSA claims against any other Club; there is no employment relationship or any wage-and-hour injury that can be attributed to any of the other Clubs.[19]

---

[19] The same result must obtain even if Wyckoff does have standing to assert antitrust claims against the 29 other Clubs because standing must be established with regard to each defendant *and* as to each claim. *See Mahon*, 683 F.3d at 64.

**b.   The hypothetical claims of putative collective members cannot confer standing that Wyckoff lacks.**

The fact that Wyckoff purports to style his FLSA claims as "collective claims"[20] does not cure these fatal standing deficiencies.  The Court does not have subject matter jurisdiction based on Wyckoff's erroneous theory that, should the collective be conditionally certified, members of the collective might have been employed by some Club(s) other than the Royals.  The law of this Circuit firmly establishes that a plaintiff may *not* rely on the hypothetical claims of putative class members to establish standing.[21]

For instance, in *McCall*, the court held that a plaintiff lacked Article III standing to assert claims arising out of contracts to which she was not a party—and that her lack of standing could not be cured merely because class members were a party to those contracts.  817 F. Supp. 2d at 315.  The court in *McCall* stated that, "[i]n a proposed class action, 'the named class plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"  *Id.* (internal citation omitted).  *See also Mahon*, 683 F.3d at 62–63 (same); *Kendall v. Employees Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009) (to qualify as a constitutionally sufficient injury, the asserted injury "must be concrete and particularized . . . not conjectural or hypothetical.").

There can be no reasonable dispute that Wyckoff lacks standing to assert FLSA claims against any entity that never employed him.  The hypothetical claims of absent members of the putative collective—none of whom have affirmatively opted in to this case—cannot cure

---

[20] *See* Plaintiff's Pre-Motion Letter,  Dkt. 105 at 2.

[21] To the extent Plaintiffs attempt to rely on the out-of-Circuit decision by a Northern District of California trial court in *Senne v. Office of the Commissioner of Baseball.*, No. 14-CV-00609-JCS, 2015 WL 4240716, at *14 (N.D. Cal. July 13, 2015), that case is inapposite and provides them with no assistance here.  Unlike the instant matter, in *Senne* at least one named plaintiff (out of 43) alleged to have been employed by ***each*** of the Clubs sued in that case; the issue was whether those plaintiffs had standing to sue under the laws of states in which they never worked. Here, on the other hand Wyckoff—the only FLSA plaintiff—alleges no employment relationship ***at all*** with 29 of the 30 Clubs.

*Wyckoff's* lack of standing to bring FLSA claims against non-employers. Accordingly, the FLSA claims against all Clubs other than the Royals must be dismissed.

> **2.      Wyckoff fails to state legally cognizable FLSA claims against any Defendant Club other than the Kansas City Royals.**

Because Wyckoff lacks threshold Article III standing to bring FLSA claims against any Club other than the Royals, the Court should dismiss those claims on this ground alone. However, to the extent that the Court concludes that subject matter jurisdiction exists, Wyckoff's FLSA claims against the 29 other Clubs should be dismissed for the additional reason that he has failed to state a claim for which relief may be granted.

To survive a motion to dismiss under Federal Rule 12(b)(6), a complaint must contain sufficient factual matter "to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  While the Court must accept the factual allegations in the complaint as true and must construe them in the light most favorable to the non-moving party, the Court can and should ignore any allegations based solely on opinions or legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' . . . will not do.").  Although the law does not require "detailed factual allegations . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*  A plaintiff must plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and not mere conclusory allegations of law.  *Id.* ("Threadbare recitals of the elements of a cause of action supported by mere conclusory statements do not suffice.")

"It should go without saying that the defendant in FLSA . . . claims must be the plaintiff's employer." *See Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc.*, No. 10 CIV. 2661 PAC, 2011 WL 321186, at *6 (S.D.N.Y. Jan. 28, 2011), *aff'd in part*, 723 F.3d 192, 201 (2d Cir. 2013).  A plaintiff will satisfy the "essential element of notice pleading" of a FLSA claim only if he alleges that the defendant is the plaintiff's "actual and direct employer." *Nakahata*, 723 F.3d at 201.  For the same reasons that Wyckoff lacks standing to bring wage-and-hour claims against

any Club for which he never worked, he also cannot state a plausible FLSA claim against any Club other than the Royals.

Here, Wyckoff does not make *any* allegations, let alone plausible allegations, that he was employed by any Club other than the Royals.[22]  Therefore, Wyckoff's FLSA claims should be dismissed on the separate and independent ground that he has failed to state any plausible wage-and-hour claim against these other 29 non-employer Clubs.[23]

## V.      CONCLUSION

For these reasons, Plaintiffs' antitrust claims and Plaintiffs' FLSA claims (except Plaintiff Wyckoff's FLSA claims against Defendants Office of the Commissioner of Baseball, Allan H. Selig, Robert D. Manfred, and the Kansas City Royals Baseball Corp.) should be dismissed with prejudice.


Dated:  November 6, 2015

Respectfully submitted,

KEKER & VAN NEST LLP                          PROSKAUER ROSE LLP


By: */s/ Elliot R. Peters*                    By: /s/ *Elise M. Bloom*
JOHN W. KEKER (*pro hac vice*)                ELISE M. BLOOM
ELLIOT R. PETERS                              ADAM M. LUPION
R. ADAM LAURIDSEN (*pro hac vice*)            Eleven Times Square
THOMAS E. GORMAN (*pro hac vice*)             New York, NY 10036-8299
633 Battery Street                            Telephone:  212-969-3000
San Francisco, CA 94111-1809                  Facsimile:  212-969-2900
Telephone:  415-391-5400
Facsimile:  415-397-7188                      Attorneys for Defendants[24]

Attorneys for Defendants

---

[22] *See* SAC at ¶ 18.

[23] *See, supra,* note 18.

[24] Proskauer Rose LLP is not serving as counsel for the Baltimore Orioles Limited Partnership or Baltimore Orioles, Inc.

## **Statutory and Legislative Addendum**

### **Table of Contents**

Curt Flood Act, codified at 15 U.S.C. § 26b.................................................................A2

Congressional Hearings on the Business of Baseball between 1972 and 2014...........................A5

**Curt Flood Act, codified at 15 U.S.C. § 26b**

§ 26b. Application of the antitrust laws to professional major league baseball.

(a) Major league baseball subject to antitrust laws

Subject to subsections (b) through (d) of this section, the conduct, acts, practices, or agreements of persons in the business of organized professional major league baseball directly relating to or affecting employment of major league baseball players to play baseball at the major league level are subject to the antitrust laws to the same extent such conduct, acts, practices, or agreements would be subject to the antitrust laws if engaged in by persons in any other professional sports business affecting interstate commerce.

(b) Limitation of section

No court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any conduct, acts, practices, or agreements other than those set forth in subsection (a) of this section. this section does not create, permit or imply a cause of action by which to challenge under the antitrust laws, or otherwise apply the antitrust laws to, any conduct, acts, practices, or agreements that do not directly relate to or affect employment of major league baseball players to play baseball at the major league level, including but not limited to

> (1) any conduct, acts, practices, or agreements of persons engaging in, conducting or participating in the business of organized professional baseball relating to or affecting employment to play baseball at the minor league level, any organized professional baseball amateur or first-year player draft, or any reserve clause as applied to minor league players;

> (2) the agreement between organized professional major league baseball teams and the teams of the National Association of Professional Baseball Leagues, commonly known as the "Professional Baseball Agreement", the relationship between organized professional major league baseball and organized professional minor league baseball, or any other matter relating to organized professional baseball's minor leagues;

> (3) any conduct, acts, practices, or agreements of persons engaging in, conducting or participating in the business of organized professional baseball relating to or affecting franchise expansion, location or relocation, franchise ownership issues, including ownership transfers, the relationship between the Office of the Commissioner and franchise owners, the marketing or sales of the entertainment product of organized professional baseball and the licensing of intellectual property rights owned or held by organized professional baseball teams individually or collectively;

> (4) any conduct, acts, practices, or agreements protected by Public Law 87-331 (15 U.S.C. 1291 et seq.) (commonly known as the "Sports Broadcasting Act of 1961");

> (5) the relationship between persons in the business of organized professional baseball and umpires or other individuals who are employed in the business of organized professional baseball by such persons; or

(6) any conduct, acts, practices, or agreements of persons not in the business of organized professional major league baseball.

(c) Standing to sue

Only a major league baseball player has standing to sue under this section. For the purposes of this section, a major league baseball player is—

(1) a person who is a party to a major league player's contract, or is playing baseball at the major league level; or

(2) a person who was a party to a major league player's contract or playing baseball at the major league level at the time of the injury that is the subject of the complaint; or

(3) a person who has been a party to a major league player's contract or who has played baseball at the major league level, and who claims he has been injured in his efforts to secure a subsequent major league player's contract by an alleged violation of the antitrust laws: Provided however, That for the purposes of this paragraph, the alleged antitrust violation shall not include any conduct, acts, practices, or agreements of persons in the business of organized professional baseball relating to or affecting employment to play baseball at the minor league level, including any organized professional baseball amateur or first-year player draft, or any reserve clause as applied to minor league players; or

(4) a person who was a party to a major league player's contract or who was playing baseball at the major league level at the conclusion of the last full championship season immediately preceding the expiration of the last collective bargaining agreement between persons in the business of organized professional major league baseball and the exclusive collective bargaining representative of major league baseball players.

(d) Conduct, acts, practices, or agreements subject to antitrust laws

(1) As used in this section, "person" means any entity, including an individual, partnership, corporation, trust or unincorporated association or any combination or association thereof. As used in this section, the National Association of Professional Baseball Leagues, its member leagues and the clubs of those leagues, are not "in the business of organized professional major league baseball".

(2) In cases involving conduct, acts, practices, or agreements that directly relate to or affect both employment of major league baseball players to play baseball at the major league level and also relate to or affect any other aspect of organized professional baseball, including but not limited to employment to play baseball at the minor league level and the other areas set forth in subsection (b) of this section, only those components, portions or aspects of such conduct, acts, practices, or agreements that directly relate to or affect employment of major league players to play baseball at the major league level may be challenged under subsection (a) of this section and then only to the extent that they directly relate to or affect employment of major league baseball players to play baseball at the major league level.

(3) As used in subsection (a) of this section, interpretation of the term "directly" shall not be governed by any interpretation of section 151 et seq. of Title 29 (as amended).

(4) Nothing in this section shall be construed to affect the application to organized professional baseball of the nonstatutory labor exemption from the antitrust laws.

(5) The scope of the conduct, acts, practices, or agreements covered by subsection (b) of this section shall not be strictly or narrowly construed.

**Congressional Hearings on the Business of Baseball between since 1972 and 2014**

1. *Professional Sports Blackouts:  Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications and Power*, 93rd Cong., 1st Sess. (1973).

2. *Rights of Professional Athletes:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 94th Cong., 1st Sess. (1975).

3. *Professional Sports and the Law:  Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

4. *Inquiry into Professional Sports:  Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

5. *Inquiry into Professional Sports:  Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

6. *Rights of Professional Athletes:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 95th Cong., 1st Sess. (1977).

7. *Sports Anti-blackout Legislation:  Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications*, 95th Cong., 2d Sess. (1978).

8. *Sports Anti-blackout Legislation:  Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications and Power*, 96th Cong., 1st Sess. (1979).

9. *Antitrust Policy and Professional Sports:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 97th Cong., 1st & 2d Sess. (1981).

10. *Antitrust Policy and Professional Sports:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 97th Cong., 1st & 2d Sess. (1982).

11. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 97th Cong., 2d Sess. (1982).

12. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 98th Cong., 1st Sess. (1983).

13. *Professional Sports Team Community Protection Act:  Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Commerce, Transportation, and Tourism*, 98th Cong., 2d Sess. (1984).

14. *Professional Sports Team Community Protection Act:  Hearing Before the Sen. Comm. on Commerce, Science, and Transportation*, 98th Cong., 2d Sess. (1984).

15. *Professional Sports:  Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Commerce, Transportation, and Tourism*, 99th Cong., 1st Sess. (1985).

16. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 99th Cong., 1st Sess. (1985).

17. *Professional Sports Community Protection Act of 1985:  Hearing Before the Sen. Comm. on Commerce, Science, and Transportation*, 99th Cong., 1st Sess. (1985).

18. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 99th Cong., 2d Sess. (1986).

19. *Antitrust Implications of the Recent NFL Television Contract:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 1st Sess. (1987).

20. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 2d Sess. (1988).

21. *Competitive Issues in the Cable Television Industry:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 2d Sess. (1988).

22. *Sports Programming and Cable Television:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 1st Sess. (1989).

23. *Competitive Problems in the Cable Television Industry:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 1st Sess. (1990).

24. *Cable Television Regulation (Part 2):  Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Telecommunications and Finance*, 101st Cong., 2d Sess. (1990).

25. *Sports Programming and Cable Television:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 2d Sess. (1991).

26. *Prohibiting State-Sanctioned Sports Gambling:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Patents, Copyrights, and Trademarks*, 102nd Cong., 1st Sess. (1991).

27. *Baseball's Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 102nd Cong., 2d Sess. (1992).

28.  *Baseball's Antitrust Immunity:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Economic and Commercial Law*, 103rd Cong., 1st Sess. (1993).

29.  *Key Issues Confronting Minor League Baseball:  Hearing Before the H. Comm. on Small Business*, 103rd Cong., 2d Sess. (1994).

30.  *Baseball's Antitrust Exemption (Part 2):  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Economic and Commercial Law*, 103rd Cong., 2d Sess. (1994).

31.  *Impact on Collective Bargaining of the Antitrust Exemption, Major League Play Ball Act of 1995:  Hearing Before the H. Comm. on Education and Labor, Subcomm. on Labor-Management Relations*, 103rd Cong., 2d Sess. (1994).

32.  *Professional Baseball Teams and the Anti-trust Laws:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 103rd Cong., 2d Sess. (1994).

33.  *The Court-Imposed Major League Baseball Antitrust Exemption:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

34.  *Antitrust Issues in Relocation of Professional Sports Franchises:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

35.  *The Court-Imposed Major League Baseball Antitrust Exemption:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

36.  *Professional Sports Franchise Relocation:  Hearing Before the H. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

37.  *Professional Sports:  The Challenges Facing the Future of the Industry:  Hearing Before the Sen. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

38.  *Major League Baseball Reform Act of 1995:  Hearing Before the Sen. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

39.  *Major League Baseball Antitrust Reform:  Hearing Before the Sen. Comm. on the Judiciary*, 105th Cong., 1st Sess. (1997).

40.  *Stadium Financing and Franchise Relocation Act of 1999: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 1st Sess. (1999).

41.  *Baseball's Revenue Gap: Pennant for Sale?: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 2d Sess. (2000).

42.  *Fairness in Antitrust in National Sports (Fans) Act of 2001:  Hearing Before the H. Comm. on the Judiciary*, 107th Cong., 1st Sess. (2001).

43.  *The Application of Federal Antitrust Laws to Major League Baseball:  Hearing Before the Sen. Comm. on the Judiciary*, 107th Cong., 2d Sess. (2002).

44.  *Out at Home: Why Most Nats Fans Can't See Their Team on TV: Hearing Before the H. Comm. on Gov't Reform*, 109th Cong., 2d Sess. (2006).

45.  *Exclusive Sports Programming: Examining Competition and Consumer Choice: Hearing Before the Sen. Comm. on Commerce, Science and Transportation, 110th Cong.*, 1st Sess. (2007).