**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

JORDAN WYCKOFF, et al., Individually and
on Behalf of All Those Similarly Situated,

                Plaintiff,

vs.

OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated association
doing business as MAJOR LEAGUE
BASEBALL, et al.;

                Defendants.

CASE NO.  1:15-cv-5186-PGG

**<u>CLASS ACTION</u>**

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

---

# Table of Contents

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

   I.   Brief description of Defendants' business. ...............................................................2

   II.   The job performed by MLB scouts. ........................................................................3

   III.   The antitrust allegations ...........................................................................................4

   IV.  The wage-and-hour allegations .................................................................................6

ARGUMENT ...........................................................................................................................7

   I.   The Scouts' Claims Fall Outside of Defendants' Limited Antitrust Exemption. ........................7

     A.  The seminal Supreme Court case on the exemption sets limits on its application ................7

     B.  Since *Flood*, lower courts have recognized that the exemption has limits,
and the cases have only applied the exemption within the areas of league
structure and player contracts. ...................................................................................8

     C.  Applying the exemption to Defendants' anticompetitive conduct toward
scouts would inappropriately expand the exemption's scope. ..................................19

     D.  The text and legislative history of the Curt Flood Act support Plaintiffs' claims ................19

     E.  If it chooses, the Court can defer this decision until summary judgment after
more facts develop ...................................................................................................22

   II.   Plaintiffs concede that their FLSA claims extend only to MLB and the
Kansas City Royals. ..................................................................................................23

CONCLUSION .......................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.H. Phillips, Inc. v. Walling,*
  324 U.S. 490 (1945) ............................................................................................................... 15

*Butterworth v. Nat'l League of Prof'l Baseball Clubs,*
  644 So. 2d 1021 (Fla. 1994) ................................................................................................. 9

*Charles O. Finley & Co. v. Kuhn,*
  569 F.2d 527 (7th Cir. 1978) .......................................................................................... 9, 13

*City of San Jose v. Office of the Com'r of Baseball,*
  776 F.3d 686 (9th Cir. 2015) ....................................................................................... *passim*

*Fed'l Baseball Club of Baltimore v. Nat'l League of Prof'l Base Ball Clubs,*
  259 U.S. 200 (1922) ................................................................................................................ 8

*Flood v. Kuhn,*
  407 U.S. 258 (1972) ..................................................................................................... *passim*

*F.T.C. v. Phoebe Putney Health Sys., Inc.,*
  133 S. Ct. 1003 (2013) ......................................................................................................... 15

*Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.,*
  541 F. Supp. 263 (S.D. Tex. 1982) ............................................................................. *passim*

*Hollander v. United States,*
  248 F.2d 247 (2d Cir. 1957) ................................................................................................ 15

*Laumann v. Nat'l Hockey League,* 56 F. Supp. 3d 280 (S.D.N.Y. 2014) *motion to certify
  appeal denied sub nom., Garber v. Office of the Com'r of Baseball,* 2014 WL 4716068
  (S.D.N.Y. Sept. 22, 2014) ............................................................................................ *passim*

*Major League Baseball v. Crist,*
  331 F.3d 1177 (11th Cir. 2003) ..................................................................................... 9, 13

*Morsani v. Major League Baseball,*
  663 So. 2d 653 (Fla. Dis. Ct. App. 1995) ........................................................................... 9

*Piazza v. Major League Baseball,*
  831 F. Supp. 420 (E.D. Pa. 1993) ................................................................................. 9, 12

*Portland Baseball Club, Inc. v. Kuhn,*
  491 F.2d 1101 (9th Cir. 1974) ............................................................................................... 9

*Postema v. National League of Professional Baseball Clubs*,
    799 F. Supp. 1475 (S.D.N.Y. 1992), *rev'd on other grounds*,
    998 F.2d 60 (2d Cir. 1993) ................................................................*passim*

*Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*,
    693 F.2d 1085 (11th Cir. 1982) ................................................................9, 21

*Salerno v. Am. League of Prof'l Baseball Clubs*,
    429 F.2d 1003 (2d Cir. 1970) ................................................................ 11, 12

*Schaffer ex rel. Schaffer v. Weast*,
    546 U.S. 49 (2005) ................................................................15

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
    476 U.S. 409, 421 (1986) ................................................................14

*Toolson v. New York Yankees, Inc.*,
    346 U.S. 356 (1953) ................................................................8

*Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*,
    832 F.2d 214 (1st Cir. 1987) ................................................................9

*U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers*,
    431 F.2d 1046 (3d Cir. 1970) ................................................................15

**Statutes**

15 U.S.C. § 26b ................................................................19

15 U.S.C. § 26b(a) ................................................................19

Pub. L. No. 105-297, 112 Stat. 2825 (Oct. 27, 1998) ................................................................20

**Other Authorities**

144 Cong. Rec. S9496 (July 30, 1998) ................................................................20

144 Cong. Rec. S9621 (July 31, 1998) ................................................................20

144 Cong. Rec. S9621 (Oct. 7, 1998) ................................................................20

Nathaniel Grow, *The Curiously Confounding Curt Flood Act*, 90 Tulane L. Rev. ___, Part
    III (forthcoming 2016), *draft available at*
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2665848 ................................................................ 20, 22

S.53, 105th Cong. Report No. 105-118, 2-3 (Oct. 29, 1997) ................................................................19

## INTRODUCTION

The anticompetitive conduct of Major League Baseball and its thirty franchises alleged in Plaintiffs' Complaint does not fall within baseball's so-called antitrust exemption. Since the Supreme Court issued *Flood v. Kuhn*[1] in 1972, lower courts have consistently recognized that the exemption has limits. Indeed, post-*Flood* courts have not applied the exemption other than in cases involving player contracts or league structure.[2] The Southern District of New York has twice declined to apply the exemption since *Flood*, once in a case involving MLB's employment relationship with umpires and, more recently, in a case involving broadcast practices.[3] Those cases have established a benchmark for evaluating baseball's anticompetitive practices to determine whether the exemption applies: whether the anticompetitive conduct is central enough to the business of baseball to be part of its unique circumstances and needs; i.e., whether it enhances the viability and vitality of the business.

Defendants' anticompetitive conduct is not central to the business of baseball, is not part of baseball's unique circumstances and needs, and does not enhance the viability and vitality of the business. The conduct does not concern player contracts or league structure, but rather involves employment relations with scouts. Defendants have instituted anti-poaching and off-set policies that stifle lateral hiring, stifle information sharing about compensation, and stifle scouts' abilities to look for better employment in the market. As a result, scouts' compensation is suppressed, and they are often effectively restricted to employment with a single Defendant. Such compensation suppression in no way affects Defendants' ability to stage baseball games.

---

[1] *Flood v. Kuhn*, 407 U.S. 258, 273 (1972).

[2] In fact, the post-*Flood* cases cited by Defendants that have applied the exemption have only done so within those two general areas.

[3] *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 291 (S.D.N.Y. 2014) *motion to certify appeal denied sub nom.*, *Garber v. Office of the Com'r of Baseball*, 2014 WL 4716068 (S.D.N.Y. Sept. 22, 2014); *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1477 (S.D.N.Y. 1992), *rev'd on other grounds*, 998 F.2d 60 (2d Cir. 1993).

Instead of being essential to the business of baseball, this conduct is meant solely to suppress competition in the scouting market. Plaintiffs' claims should be permitted to go forward.

## FACTUAL BACKGROUND

### I.   Brief description of Defendants' business.

This antitrust and wage-and-hour case challenges Defendants' employment practices in the market for MLB scouts.[4] Defendants are the Office of the Commissioner of Baseball ("MLB"), all 30 MLB franchises, and MLB's former and current commissioners. *See* SAC ¶¶ 20–64. Defendants operate through a unified constitution and unified rules that give MLB the power to implement and enforce collusive agreements. *Id.* ¶ 21. The constitution created MLB and binds Defendants together as an association of franchises. *Id.* ¶ 83. The unified rules, known as the Major League Rules, are attached to the SAC.

The Commissioner of Baseball is the CEO of MLB. *Id.* ¶ 24. He oversees Defendants' entire business and enforces and implements Defendants' Major League Rules, constitution, and agreements. *Id.* ¶¶ 25, 85. A Major League Executive Council assists the Commissioner in these duties. *Id.* ¶¶ 87–88. The Council consists of the Commissioner and representatives from eight MLB franchises. *Id.* ¶ 87. The Council recommends changes to rules and regulations, which are often presented at the Major League Meetings held by Defendants four times per year. *Id.* ¶ 89.

In addition to gate revenues from exhibitions of baseball, Defendants obtain enormous revenue from broadcast rights deals and other deals such as merchandising. *Id.* ¶¶ 79–80. Revenue has grown exponentially in the last 20 years, and the average MLB franchise is now valued at over $1 billion. *Id.* ¶¶ 78–81.

---

[4] All references will be to the Second Amended Complaint ("SAC") (Dkt. 109).

## II.     The job performed by MLB scouts.

Plaintiffs believe Defendants employ well over a thousand scouts. SAC ¶ 92. The basic job of a scout is to evaluate players' skills. *Id.* ¶ 93. They do so while attending games—often at high schools, colleges, international games, minor league games, and sometimes major league games. *Id.* ¶¶ 93, 97, 148. Some scouts focus more on amateur players while others focus more on professional players, but the basic job remains the same: to evaluate players and present this information in reports. *Id.*

The reports use a basic scouting scale ranging from 20 to 80, with 80 representing the highest possible grade. *Id.* ¶ 94. Although the reports provide information to Defendants that assist them in determining which players to pursue, the scouts are removed from the actual decision-making process. *Id.* ¶ 95. They do not make the final decisions on which players to sign, do not determine the compensation for players, and do not perform other similarly important services. *Id.* Instead, front office personnel generally perform those services. *Id.*

Unlike players and coaches, scouts do not perform in-game activities or any other services required for staging professional baseball games. *Id.* ¶ 96. Similarly, the information scouts provide does not relate directly to the business of professional baseball or Defendants' revenue streams. *Id.* The information gathered is useful, but not essential to Defendants' business of staging professional baseball games. *Id.*

Plaintiffs are two former MLB scouts. SAC ¶¶ 18–19. Jordan Wyckoff worked as an MLB scout for the Kansas City Royals from October 2012 to October 2013. *Id.* ¶ 18. Darwin Cox worked as an MLB scout for the Colorado Rockies until December 2011. *Id.* ¶ 19. Both signed Uniform Employment Contracts, which must be approved by the Commissioner. *See id.* ¶¶ 100, 103, 116. Both scouted primarily amateur players, with Mr. Wyckoff assigned to states in the Northeast and Mr. Cox assigned to the region of North Texas, Oklahoma, and Kansas. *Id.* ¶¶ 146, 159.

3

III.    **The antitrust allegations.**

The antitrust aspect of this case focuses on three main practices: (1) the agreement to not recruit, poach, or cold call scouts employed by other MLB franchises for potential job opportunities; (2) the related agreement forbidding a scout from discussing employment opportunities with another MLB franchise without first receiving permission from his employer; and (3) the agreement to offset compensation paid to scouts fired by one MLB franchise but then hired by another MLB franchise. *See* SAC ¶ 3.

The first two practices together form an anti-poaching agreement among horizontal competitors. *Id.* ¶ 115. This anticompetitive conduct results partly from the extension of Major League Rule 3(k) to scouts. *Id.* ¶¶ 116–17. The Rule states that "[t]o preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment" between these categories of workers and a Defendant if that worker is already employed by another Defendant. *Id.* ¶ 116. If a Defendant wants to speak with a coach or player under contract with a second Defendant, the first Defendant must obtain written authorization from the second Defendant. *Id.*

On its face, Rule 3(k) applies only to players, coaches, managers, and umpires. But Plaintiffs allege that Defendants have conspired to implement a similar, unwritten rule to MLB scouts to suppress competition in the scouting labor market. *Id.* ¶ 117. The conspiracy thus prohibits communication about job opportunities while a scout is under contract with a Defendant. A scout under contract with the New York Mets, for example, cannot talk to other Defendants about an employment opportunity. *Id.* ¶ 118. Also, the other Defendants cannot cold call the Mets' scouts about an employment opportunity. *Id.* Another Defendant must first receive permission from the Mets' front office, which is generally only granted if the other job opportunity would be a promotion for the scout. *Id.* ¶ 119. Even then, the Mets are not required to grant permission. *Id.*

In a properly functioning, competitive labor market, each Defendant would compete for scouts and lateral hiring would occur unimpeded. *Id.* ¶ 128. For example, if another Defendant believed one of the Mets' scouts did his job well, that Defendant would be free to cold call the scout and offer greater compensation to entice a lateral move. *Id.* ¶ 129. And if a Mets' scout believed that another Defendant offered better wages or other benefits than the Mets, the scout could contact the other Defendant about employment opportunities. *Id.* The anti-poaching agreement, however, prohibits this competitive activity from occurring, which inhibits lateral hiring and restrains the labor market. With some exceptions, the scout is stuck with his employer until his employer gets rid of him.

The restrictions on lateral hiring suppress employee compensation. *Id.* ¶¶ 134–38. After all, prohibitions on cold-calling lead to less leverage, less information in the market regarding compensation, and less transparency in the market. *Id.* The result is lower baseline compensation levels in the market, which in turn harms all scouts in the labor market—not just those who would receive cold calls or who would desire to move laterally. *Id.* ¶¶ 137–39.

Defendants have also colluded to institute an offset policy to the detriment of scouts. The policy applies to a scout fired by one Defendant before the expiration of the scouting contract but hired by another Defendant. *Id.* ¶ 108. If the scout is still contractually entitled to compensation from his former employer, then his compensation due from his old employer will be offset by the amount being paid under his new contract with the new employer. *Id.* Thus, the offset policy, which is administered by MLB, prevents a scout from gaining compensation from both the firing club and hiring club. *Id.* ¶ 111. Without the policy, a scout would also be more free to negotiate a salary with another Defendant, and Defendants would be less likely to fire their scouts during the pendency of the scouting contracts. *Id.* ¶¶ 112–13.

These naked restraints on the scouting labor market differ significantly from Defendants' agreements to limit competition for baseball player services. *Id.* ¶ 123. For many years, Defendants have used reserve clauses and other means[5] to control player transactions. The players, of course, certainly play a central role in the staging of baseball games. Thus, while an agreement to control player movements may be essential to staging professional baseball games and may enhance the vitality and viability of baseball, the anticompetitive restraints in the labor market for scouting services is not essential and in no way enhances the vitality or viability of baseball. *Id.*

## IV.    The wage-and-hour allegations.

Plaintiff Wyckoff also brings wage-and-hour claims under the Fair Labor Standards Act ("FLSA"). Mr. Wyckoff alleges that he was paid $15,000 for an entire year, or around $300 per week. SAC ¶ 147. While he was termed a part-time scout, he was actually expected to perform the same work and duties as a full-time scout. *Id.* He often worked in excess of forty hours per week, and yet he never received overtime pay and sometimes worked for a wage rate that fell below minimum wage requirements. *Id.* ¶¶ 149–54.

Mr. Wyckoff brings both individual and collective claims. The putative collective includes "all persons similarly situated who elect to opt into this action and who work or have worked for Defendants as MLB scouts" since July 2, 2012. *Id.* ¶ 74. Although the SAC never explicitly states that Mr. Wyckoff seeks to bring his FLSA claims against *all* Defendants, Plaintiffs have clarified in a letter to Defendants that Mr. Wyckoff does not seek to do so. Instead, Mr. Wyckoff brings his FLSA claims only against MLB and the Kansas City Royals, which moots the FLSA portion of Defendants' motion to dismiss.

---

[5] As the Court in *Flood* explained, the reserve clause, found in player contracts, gave indefinite rights to the contracting MLB franchise to assign the player's contract or to renew the player's contract at a unilaterally set salary. 407 U.S. at 259 n.1.

## ARGUMENT

I.    **The Scouts' Claims Fall Outside of Defendants' Limited Antitrust Exemption.**[6]

    **A.  The seminal Supreme Court case on the exemption sets limits on its application.**

In 1972, the Supreme Court issued *Flood v. Kuhn*, its most recent decision concerning the applicability of the Sherman Act to professional baseball. 407 U.S. 258, 273 (1972). *Flood* concerned a player's reserve clause in player contracts. Such clauses gave indefinite rights to the contracting MLB franchise to assign the player's contract or to renew the player's contract at a unilaterally set salary. *Id.* at 259 n.1. The plaintiff, Curt Flood, was a star center fielder for the St. Louis Cardinals who was traded to the Philadelphia Phillies without his approval. *Id.* at 265. Flood then challenged the reserve clause under antitrust laws. *Id.*

After reviewing the judicial history of baseball's antitrust exemption, the *Flood* Court announced guiding principles, including the following:

- "Professional baseball is a business and it is engaged in interstate commerce."

- "With its *reserve system* enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball."

- "Even though others might regard this as 'unrealistic, inconsistent, or illogical,' the aberration is an established one…It rests on a recognition and an acceptance of baseball's *unique characteristics and needs*…"

---

[6] During the parties' initial pretrial conference, the Court stated that it was familiar with the Supreme Court's trilogy of decisions on baseball's so-called exemption from antitrust laws. This memorandum will consequently focus primarily on decisions interpreting the scope of baseball's antitrust exemption. Only a brief introduction to the Supreme Court's decisions follows.

- "Remedial legislation has been introduced repeatedly in Congress but none has ever been enacted. The Court, accordingly, has concluded that Congress as yet has had no intention to subject baseball's *reserve system* to the reach of the antitrust statutes."

*Flood*, 407 U.S. at 282–83 (emphasis added) (internal citations omitted). The Supreme Court thus held that (1) Flood's antitrust claims regarding the reserve clause were barred by the exemption, and (2) it did not need to determine whether federal labor policy exempted the reserve system from federal antitrust laws. *Id.* at 284–85.

Before 1972, the Supreme Court had issued two decisions on the applicability of the Sherman Act to baseball. The first, *Federal Baseball Club of Baltimore v. National League of Professional Base Ball Clubs*, involved a baseball club suing the National League and American League (the major leagues) of conspiring to suppress competitor leagues and limit the number of teams. 259 U.S. 200, 207 (1922). The Court held that "giving exhibitions of base ball" were "purely state affairs" and outside of interstate commerce, so the Sherman Act did not apply. *Id.* at 208. The second Supreme Court case involved a player's reserve clause. *See Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357 (1953). It affirmed *Federal Baseball* in an opinion consuming only a single paragraph. *Id.*

Importantly, before *Flood* it might have been argued that the exemption extended broadly since the Supreme Court had held that the exemption was premised on lack of interstate commerce. *Federal Baseball*, 259 U.S. at 208. But *Flood* directly undercut that holding by explicitly stating that professional baseball operates within interstate commerce. *Flood*, 407 U.S. at 282–83. Thus, limits have been set on the exemption's reach.

**B. Since *Flood*, lower courts have recognized that the exemption has limits, and the cases have only applied the exemption within the areas of league structure and player contracts.**

All the Supreme Court cases concerned two issues: league structure and the reserve system for players. Indeed, since *Flood*, many cases have analyzed the scope of the exemption, and the cases

that have affirmatively applied the exemption have done so within the same two general areas:

league structure and player contracts (related to the reserve system). The post-*Flood* cases cited in

footnote 7 of Defendants' brief illustrate this point.[7] When cases say that the exemption applies to

the business of baseball, they do so only in the context of analyzing these same two areas.[8]

This case, however, does not involve issues of league structure or player contracts. Instead,

this case involves scouts, and more specifically, a conspiracy to suppress competition in the labor

market for scouts. The exemption does not reach such conduct.

When analyzing conduct outside the two narrow areas of league structure and player

contracts, courts after *Flood* have consistently held that the exemption does not apply.[9] In fact,

Defendants cite to no case after *Flood* that applies the exemption beyond player contracts and league

structure. Although no Second Circuit case since *Flood* has considered the issue, two Southern

---

[7] *Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 216 (1st Cir. 1987) (involving league structure, and simply noting the exemption in a footnote in a breach of contract claim); *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 531, 541 (7th Cir. 1978) (upholding the Commissioner's veto of a trade involving players reserved to the Oakland Athletics); *City of San Jose v. Office of the Com'r of Baseball*, 776 F.3d 686, 690 (9th Cir. 2015) (involving franchise relocation); *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101, 1103 (9th Cir. 1974); *Major League Baseball v. Crist*, 331 F.3d 1177, 1183 (11th Cir. 2003) (number of teams was central to league structure, so exempt); *Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1086 (11th Cir. 1982) (involving franchise location and player assignments).

[8] Even when it comes to franchise relocation, however, the applicability of the exemption is not completely settled. *Piazza v. Major League Baseball*, for instance, involved the possible relocation of the San Francisco Giants to Tampa Bay, Florida. 831 F. Supp. 420, 421 (E.D. Pa. 1993). In a thorough analysis of the scope of the exemption, the *Piazza* court held that *Flood* had undercut the reasoning of *Federal Baseball. Id.* at 436. It also noted that *Flood* had repeatedly referenced the reserve system, and the congressional inactivity was aimed towards the reserve system. *Id.* It then found that relocation disputes were outside of the exemption. *Id.* at 438, 441. Other courts followed *Piazza*'s findings. *See Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So. 2d 1021 (Fla. 1994); *Morsani v. Major League Baseball*, 663 So. 2d 653 (Fla. Dis. Ct. App. 1995). *Piazza* has not been widely followed, however. *See, e.g., City of San Jose v. Office of the Com'r of Baseball*, 776 F.3d 686, 690 (9th Cir. 2015); *Major League Baseball v. Crist*, 331 F.3d 1177, 1183 (11th Cir. 2003). In light of these decisions rejecting *Piazza*, the law is becoming more settled that the exemption applies to issues of franchise relocation. But the cases offer no support for Defendants' proposition that the exemption should be extended to employment relationships with non-essential personnel like scouts.

[9] *E.g., Laumann*, 56 F. Supp. 3d at 291; *Postema*, 799 F. Supp. at 1477; *Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 264 (S.D. Tex. 1982).

District of New York cases have done so. Both cases correctly interpreted the antitrust exemption narrowly and allowed claims to move forward.

The most analogous case is *Postema v. National League of Professional Baseball Clubs*, which found that an umpire's claims concerning her employment relations with her baseball employers were outside the antitrust exemption. 799 F. Supp. 1475, 1477 (S.D.N.Y. 1992), *rev'd on other grounds*, 998 F.2d 60 (2d Cir. 1993). A female umpire alleged that the American League, National League, and other defendants collusively refused to employ her as a major league umpire, so she brought restraint of trade claims. *Id.* at 1480, 1486. When analyzing those claims, Judge Patterson began by examining the history of baseball's antitrust exemption. *Id.* at 1487. The court found that the Supreme Court cases "considered the baseball exemption in very limited contexts, i.e. with regard to baseball's reserve clause and to its league structure." *Id.* at 1488. Those cases therefore gave "little guidance in determining the breadth of baseball's immunity to antitrust liability." *Id.* According to the court, *Flood* stated its holding was based on "a recognition and acceptance of baseball's unique characteristics and needs," so issues outside of the unique characteristics and needs "might not be exempt." *Id.* Judge Patterson concluded: "It is … clear that although the baseball exemption does immunize baseball from antitrust challenges to its league structure and its reserve system, the exemption does not provide baseball with blanket immunity for anticompetitive behavior in every context in which it operates." *Id.* at 1489. To fall within the exemption, the court held that the anticompetitive conduct itself must be "central enough to baseball" to be within the exemption. *Id.* (*citing Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 264 (S.D. Tex. 1982).

Applying this test, the court determined that the league defendants' anticompetitive conduct concerning employment relations with umpires was not "central enough to baseball" to be exempt from the antitrust laws. *Id.* Indeed, "[u]nlike the league structure or the reserve system, baseball's relations with non-players are not a unique characteristic or need of the game," and thus

anticompetitive conduct involving such employment relations is not within the scope of the exemption. *Id.*[10] This holding is directly applicable here, where Defendants' anticompetitive conduct is directed at non-player employees and as such is not based on a unique characteristic or need of baseball. Moreover, scouts are even less connected to the business of staging baseball games than umpires because scouts have no role in the actual staging of such games—in contrast to umpires, who officiate the games themselves.

Just last year, a second case within this District reached a similar conclusion. *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 291 (S.D.N.Y. 2014) *motion to certify appeal denied sub nom.*, *Garber v. Office of the Com'r of Baseball*, 2014 WL 4716068 (S.D.N.Y. Sept. 22, 2014). In *Laumann*, the plaintiffs challenged the NHL's and MLB's practices of blacking out certain games that might otherwise be watched via an Internet streaming package. *Id.* at 288. When considering *Flood*, Judge Scheindlin found the Supreme Court "made specific reference to the reserve system throughout its analysis, permitting a narrower reading of the exemption." *Id.* at 295-96. The court also determined that the Curt Flood Act (discussed at greater length, *infra* pp. 19–22) did not support a broader interpretation. *Id.* at 296-97. The court "decline[d] to apply the exemption to a subject that is not central to the business of baseball." *Id.* at 297; *see also Henderson*, 541 F. Supp. at 272 (reaching the same conclusion in a broadcasting case and stating: "The baseball exemption today is an anachronism. Defendants have not presented a reason to extend it.").

Defendants ask this Court to greatly expand the scope of baseball's antitrust exemption at a time when courts and observers have consistently narrowed it. Indeed, despite the clear weight of

---

[10] In arriving at this conclusion, the *Postema* court distinguished an old Second Circuit case that had found that conduct directed at umpires fell within the exemption. *See Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1006 (2d Cir. 1970). Since *Salerno* predated *Flood*, Judge Patterson concluded that *Salerno* likely would have been decided differently after *Flood. Postema*, 799 F. Supp. at 1489. After all, *Salerno* "ruled without discussion that the baseball exemption applied" and did not have the benefit of *Flood*'s anchoring the exemption to baseball's "unique characteristics and needs." *Id.* The court therefore ultimately held "[a]nti-competitive conduct toward umpires is not an essential part of baseball and in no way enhances its vitality or viability." *Id.*

authority since *Flood*, Defendants rely heavily on pre-*Flood* cases like *Salerno*, 429 F.2d at 1005, a

Second Circuit case from 1970. That reliance is misplaced. First, the *Salerno* court found that the

complaint at issue did not even state a claim for relief under the antitrust laws, and, even if it did, it

determined that it would likely not have jurisdiction over a labor matter since the NLRB was

investigating the dispute. *Id.* at 1004–05. Second, its dicta spoke negatively of the exemption, stating

"that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days, that the rationale of *Toolson* is

extremely dubious and that, to use the Supreme Court's own adjectives, the distinction between

baseball and other professional sports is 'unrealistic,' 'inconsistent' and 'illogical.'" *Id.* at 1006. Third,

*Salerno* predated *Flood*. As other courts (such as *Postema*) have concluded,[11] it is likely that pre-*Flood*

decisions like *Salerno* would have reached a different conclusion after *Flood* in light of *Salerno*'s dicta

and the narrowing in the law following *Flood*. Fourth, the anticompetitive conduct found here

involves scouts—not umpires—and, as explained below, the conduct here is even less central to the

business of baseball than conduct applied towards umpires.

     Even the cases most relied upon by Defendants do not support the proposition that the

exemption applies broadly to everything that baseball touches. *San Jose*, for example, determined that

the exemption was broad enough to encompass an issue of league structure. 776 F.3d at 691. In so

doing, it held that franchise relocation policies were part of "the league's basic organizing principle,"

that such rules were "central to a sports league's proper functioning," that they were designed to

"safeguard the profitability—and thus viability—of each ball club," and that interfering with those

rules "indisputably interferes with the public exhibition of professional baseball." *Id.* at 690. The

court also held that the exemption did not bar *all* antitrust suits involving professional baseball

because the exemption does not mean "that MLB or its franchises are immune from antitrust suit."

---

[11] *Postema*, 799 F. Supp. at 1489; *cf. Piazza*, 831 F. Supp. at 440 n.1 (discussing that *Salerno* was
decided before *Flood*); *Henderson*, 541 F. Supp. at 271–72 (noting that *Salerno* had stated that *Federal
Baseball* was poorly decided and lacked continuing rationale).

*Id.* It concluded that antitrust liability might attach to activities wholly collateral to "the public display of baseball games," but franchise relocation rules did not fall within that category. *Id.* Other cases relied upon by Defendants have made similar statements.[12]

With the exception of its discussion on the Curt Flood Act (addressed below), the *San Jose* case is congruous with *Postema* and *Laumann*. Judge Patterson in *Postema* indicated that matters of "league structure and its reserve system" fall within the exemption, 799 F. Supp. at 1489, so he likely would have reached the same conclusion as the *San Jose* court if presented with an issue of league structure. *Postema* also found that activities "central enough" to baseball fell within the sport's unique characteristics and needs, and that anticompetitive conduct toward an umpire did not enhance the "viability" of the business. *Id.* The *San Jose* court used similar language, finding that the franchise relocation rules were "central to" the business's functioning, and that they safeguarded "the viability" of the business. 776 F.3d at 690. The Eleventh Circuit in *Crist* also used similar language in a case involving league structure. 331 F.3d at 1183 ("[T]he Attorney General argues that the exemption has limits…[That] position is no doubt correct...Rather, the issue of contraction concerns a matter that is *central to* baseball's league structure." (emphasis added)).

Together, the authority on the scope of the exemption is clear: it does not cover anticompetitive conduct other than in the context of league structure and player contracts.

---

[12] *See Crist*, 331 F.3d at 1183 ("[T]he Attorney General argues that the exemption has limits…[That] position is no doubt correct...Rather, the issue of contraction concerns a matter that is central to baseball's league structure."); *Charles O. Finley & Co.*, 569 F.2d at 541 n.51 (recognizing that the "exemption does not apply wholesale to all cases" relating to baseball, but finding that a dispute involving player trades and player contracts was within the exemption).

**C.  Applying the exemption to Defendants' anticompetitive conduct toward scouts would inappropriately expand the exemption's scope.**

Regardless whether the exemption applies to any anticompetitive conduct other than in the context of league structure or player contracts, *Postema* articulates the proper test: whether the conduct is "central enough" to baseball to be part of the business's "unique circumstances and needs." 799 F. Supp. at 1489; *see also Henderson*, 541 F. Supp. at 264, 268–69. Such a test is correctly grounded in the language used in *Flood*, which held that the original basis for the exemption in 1922 (lack of interstate commerce) no longer applied, and that the reserve system related to baseball's unique circumstances and needs. It also comports with the language used by multiple circuit courts, such as *San Jose* and *Crist*. And, as will be demonstrated, it is supported by the text and legislative history of the Curt Flood Act.

Further, the test properly focuses not just on the area of business but also on the conduct itself. *Cf. Henderson*, 541 F. Supp. at 271 (stating that the focus should be on both the "particular activity and the particular market in question"). After all, if examined widely, almost any area of business touching baseball (including broadcasting or even accounting) will relate to the business of baseball, which would render the *Postema* test (and the qualifying statements in *San Jose* and *Crist*) meaningless and subject everything to the exemption. Instead, the test should also focus on the conduct to determine whether it forms part of the business's unique circumstances and needs so as to be essential to the business. Such conduct would thus involve the viability of the business. But issues outside of that context do not concern the business's viability, meaning that there would be no need or reason to exempt them.

Importantly, the *Postema* test must also be considered in the context of the well-established maxim that exceptions to the antitrust laws must be narrowly construed. *See, e.g., Laumann*, 56 F. Supp. 3d. at 297 (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421 (1986)

and *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1010 (2013)); *cf. A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed."); *Hollander v. United States*, 248 F.2d 247, 251 (2d Cir. 1957) ("It is axiomatic that such a statute should be construed in favor of those intended to be benefited.").[13]

The anticompetitive conduct here is not sufficiently central to the business of baseball and does not relate to the viability of the business. The conduct involves the suppression of competition for scouting services. The illicit horizontal agreements at issue are neither essential nor central to staging baseball games. Indeed, eliminating the conduct would have no effect on Defendants' ability to stage baseball games, hire players, or otherwise participate in the business of baseball. Rather, eliminating the conduct would result in increased competition for scouts' services and a corresponding increase in compensation paid to scouts.

In the absence of a proper justification for the anticompetitive conduct, Defendants focus more broadly on the overall importance of scouts to the franchises' selection of players. Defendants miss the point. To fall within the scope of the exemption, the anticompetitive conduct itself must be central to the business of baseball. Defendants' focus on the importance of scouts is inapposite.

But even to the extent the importance of scouts is relevant, Defendants have not and cannot demonstrate that the role of a scout is central enough to staging baseball games to fall within the exemption. A scout watches from the stands and turns in reports for others in higher positions to

---

[13] Defendants, however, ask the Court to do the opposite: to interpret an exemption broadly to curtail the effect of remedial legislation. If Defendants' position is accepted, baseball would be free to act collusively in any dealings with any entities. The effect would be to render the Sherman Act meaningless when any conduct touches anything related to baseball. Congress did not intend such a result when it passed the Sherman Act over a century ago, and the Supreme Court did not intend such a result when analyzing dealings related only to league structure and player contracts. Defendants should bear the burden of establishing that the exemption applies. *Cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (burden of proof may be shifted to defendants for affirmative defenses or exemptions); *U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1051 (3d Cir. 1970) (burden on union to show exemption from antitrust laws applied). They have not done so.

15

analyze.[14] The events scouts attend are often high school or other amateur practices or games, which assuredly are not part of Defendants' business. The job assignments of Plaintiffs Wyckoff and Cox illustrate this fact. Mr. Wyckoff primarily scouted amateur players, and he did so by attending high school and college events in his assigned states in the Northeast—far from where the Kansas City Royals play their games. Similarly, Mr. Cox also evaluated amateur players, and he did so in his assigned region of Texas, Oklahoma, and Kansas—also far from where the Colorado Rockies play games.

Scouts do not make high-level decisions affecting the exhibitions of baseball. Although the scouting reports supply information that leads to the eventual signing of some players to contracts, that role is attenuated. Higher-level front office employees ultimately make the *decision* to sign the player and set compensation levels—not the scouts. SAC ¶ 95. And managers, coaches, and higher personnel determine whether a signed player steps onto the field during games and what role the player has in games.

Further, the labor market for scouts is more removed from the core business of baseball than that of umpires. The Official Baseball Rules, for instance, govern the play during baseball games, and they mention the word umpire *825 times*.[15] The word scout, however, is never mentioned because scouts do not actively participate in Defendants' baseball games. Similarly, the Major League Rules (Defendants' unified operating rules) mention umpires 39 times, and entire sections are devoted to umpires. Scouts are mentioned far less frequently, and almost always in passing. The umpire is involved in every play of every exhibition of baseball, and is thus an active and integral participant (as demonstrated by players' and managers' arguments with umpires). Scouts, on the contrary, passively sit in the stands alongside the fans, often at amateur practices or games involving

---

[14] For citations to the complaint for this and the paragraphs that immediately follow, see *supra*, Factual Background, Part II, "**The job performed by MLB scouts.**"

[15] Official Baseball Rules, 2015 Ed., *available at* http://mlb.mlb.com/mlb/downloads/y2015/official_baseball_rules.pdf.

college kids and high schoolers, thousands of miles from his employer's home stadium. Because *Postema* held that MLB's employment relationship with umpires is not covered by baseball's antitrust exemption, it follows that Defendants' employment relationship with scouts is likewise outside the exemption's scope.

The labor market for scouts also lies farther from the core business of baseball than broadcasting rights. As noted above, Defendants derive enormous revenue from broadcast revenues. And these broadcast revenues stem directly from the exhibitions of professional baseball games on television and other media. Yet when evaluating alleged anticompetitive restraints related to these broadcasts, multiple courts (including Judge Schiendlin) have correctly found that they did not fall within baseball's exemption. For reasons stated previously, scouting services are even more collateral to the actual exhibitions of baseball than broadcasts.

Defendants advocate that, instead of the *Postema* test, the Court should use a test based on language used in *San Jose*: whether the conduct is "wholly collateral to the public display of baseball games." 776 F.3d at 690. The Court should reject this test since, as indicated previously, other language from *San Jose* is congruous with *Postema*, and *Postema* analyzed an issue more similar to Plaintiffs' claims than the franchise relocation issue in *San Jose*. But even if the Court were to apply the *San Jose* test, it would need to narrowly construe the exemption. *See, e.g.*, *Laumann*, 56 F. Supp. 3d. at 297.

Applying the exemption narrowly under the *San Jose* test, the anticompetitive conduct—and the actual job performed by scouts—is wholly collateral to the public display of baseball games, making the conduct outside the exemption's scope. Again, limiting competition for scouting services and suppressing scout compensation does not relate to (and is thus wholly collateral to) the public display of baseball games. Even if the scouting duties are examined, scouts generally perform their jobs far from where Defendants stage professional baseball games. They supply information on

17

current and prospective players as might be done by many other types of employees—and as might be done in many other types of industries that need to evaluate current or prospective employees. Any link between the information gathered by scouts and the public display of baseball games is attenuated at best.

Perhaps recognizing this fact, Defendants repeatedly attempt to equate their anticompetitive conduct with the reserve system for players and with MLB's broader "anti-tampering clause." Yet the reserve system emanated from a separate clause found in player contracts—a clause that still exists in some form in minor league players' contracts. *See Flood*, 407 U.S. at 259 n.1. That clause is not at issue here because this suit does not involve player contracts.

Likewise, the broader anti-tampering clause is not directly challenged here. That clause, found in Rule 3(k) of the Major League Rules, applies to players, coaches, and umpires—or on-field personnel.[16] While Plaintiffs quote the anti-tampering clause in their complaint,[17] Plaintiffs do not actually challenge the validity of that clause because this suit *does not involve players, coaches, or umpires*. Since that clause applies to on-field personnel, it may in some way relate to the viability of the business. For instance, the industry may need to prohibit tampering with an umpire's contract during the season to avoid attempts to influence an umpire's judgment in a game, or it may need to assert rules on competition for player services. SAC ¶ 123.

Plaintiffs instead challenge a needless anti-poaching agreement and off-set policy in the labor market for scouts. While the anti-poaching agreement might have resulted in part from the *extension* of the anti-tampering clause, the scouts themselves are not even included in Rule 3(k)'s anti-tampering clause—likely because, unlike coaches, players, and umpires, scouts are not on-field personnel and are thus not a unique part of staging baseball games. There consequently is no need or rationale for the conspiracy to suppress the labor market for scouts. Tellingly, Defendants do not

---

[16] SAC, Ex. A, MLR 3(k).
[17] SAC, ¶ 116.

even attempt to provide a rationale or need for the behavior.[18] The conduct is meant solely to decrease employee mobility (and ultimately compensation) for a group of workers who do not participate in the exhibitions of baseball. Such conduct in the scouting labor market is in no way essential, and it is not central enough to the business to form part of baseball's unique circumstances and needs. The exemption does not apply.

### D. The text and legislative history of the Curt Flood Act support Plaintiffs' claims.

The text and the legislative history of the Curt Flood Act support this result. *See* 15 U.S.C. § 26b. Congress enacted The Curt Flood Act of 1998 in response to ongoing labor disputes between MLB and major league baseball players. *See* S.53, 105th Cong. Report No. 105-118, 2-3 (Oct. 29, 1997) (noting that the mid-1990's MLB strike highlighted the need for Congress to establish fair and open competition to the business of baseball).

The Act has two primary subsections. Subsection (a) extends the application of antitrust laws to matters "directly relating to or affecting" major league baseball players' employment. 15 U.S.C. § 26b(a). Subsection (b) forbids courts from using the Act as a basis for "changing the application of antitrust laws to any conduct, acts, practices, or agreements other than those set forth in subsection (a) of this section." *Id.* § 26b(b). It also establishes that the Act "does not create, permit or imply a cause of action" for matters outside the scope of major league players' employment, including but not limited to the minor leagues, franchise expansion or relocation, and the employment relationship between "umpires or other individuals who are employed in the business of organized professional baseball…" *Id.* § 26b(b)(1)-(6).

Some courts, such as *San Jose*, 776 F.3d at 691, have relied on subsection (b) to conclude that Congress intended to leave the antitrust exemption broad when it passed the Curt Flood Act.

---

[18] While Defendants attempt to justify the need for the anti-tampering clause when it comes to on-field personnel such as umpires and players, they do not even attempt to provide justification for their conduct in the scout labor market.

Neither the text nor the legislative history supports this conclusion, as Congress actually intended to leave the issue open to judicial interpretation, and it went to great lengths to try to ensure a stance of neutrality.

Starting with the text, a close examination of subsection (b) reveals that Congress intended that portion of the Act to be neutral.[19] The phrase "does not create, permit or imply a cause of action" means exactly that: Congress did not intend to affirmatively create a new cause of action in those areas by passing the Act. But that text does *not* mean that Congress intended the opposite: to *disallow* a cause of action in those areas. The text should not be read to imply anything more than what it actually states—the desire to not create does not imply the desire to destroy.

Abundant legislative history from the Act's sponsors supports this textual interpretation. As the Act's preamble states, the purpose was to "state that major league baseball players are covered under the antitrust laws . . . along with a provision that makes it clear that the passage of this Act does not change the application of the antitrust laws in any other context or with respect to any other person or entity." Pub. L. No. 105-297, 112 Stat. 2825 (Oct. 27, 1998). Senator Orrin Hatch, a co-sponsor, explained that the Act goes to great lengths "to emphasize its neutrality" on issues other than those pertaining to major league players. *See* 144 Cong. Rec. S9496 (July 30, 1998) (statement of Sen. Hatch). He further explained that courts should not "use the enactment of this Act to glean congressional intent as to the validity *or lack thereof* of such actions." *Id.* at S9497 (emphasis added).

The legislative history also shows that Congress was aware of the unsettled nature of the scope of the exemption at the time it passed the Act. At the time of its passage, courts were split on whether the exemption applied to franchise relation issues. The *Piazza* and *Butterworth* courts

---

[19] *See generally* Nathaniel Grow, *The Curiously Confounding Curt Flood Act*, 90 Tulane L. Rev. ___, Part III (forthcoming 2016), *draft available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2665848 (examining the text of the Act and concluding that Congress intended it to be neutral).

(discussed above in note 8) had just held that the exemption did not apply to franchise relocation issues, while the Eleventh Circuit had earlier held the opposite.[20]

In debates shortly before the Act's passage, Senator Paul Wellstone specifically asked the Act's co-sponsors about this split in authority. 144 Cong. Rec. S9621 (July 31, 1998) (statement of Sen. Wellstone). Senator Hatch re-assured Senator Wellstone that the Act was not meant to resolve the split, but was meant instead merely "to clarify the status of major league players under the antitrust laws." *Id.* (statement of Sen. Hatch). For all other contexts, "the law will be the same after passage of the Act as it is today." *Id.* Fellow co-sponsor Senator Patrick Leahy reiterated this point: "The bill affects no pending or decided cases except to the extent that courts have exempted … dealing[s] with major league players…The bill has *no impact* on the recent decisions in federal and state courts in Florida [and] Pennsylvania." *Id.* (statement of Sen. Leahy) (emphasis added). Co-sponsors in the House of Representatives echoed those sentiments.[21]

Thus, Congress was explicitly aware of the unsettled scope of the exemption, and yet it chose to remain neutral. The *San Jose* case concluded that since "Congress specifically legislate[d]" in the field yet exempted an issue from the legislation, the "ability to infer congressional intent to leave that issue undisturbed is at its apex." 776 F.3d at 691. It then used this rationale as a basis for concluding that Congress intended the exemption to encompass franchise relocation. But, as described above, the applicability of the exemption to franchise relocation issues was unsettled at the time Congress passed the Act. Thus, congressional inaction should not be used to infer anything

---

[20] *Prof'l Baseball Sch. & Clubs, Inc.*, 693 F.2d at 1086.

[21] 144 Cong. Rec. S9621 at H9943 (Oct. 7, 1998) (statement of Rep. Hyde) (stating the bill was "extremely narrow" and left "completely unchanged all aspects" of the exemption outside of labor relations involving major league players). Representatives Conyers and Clay also urged courts to look to the purpose section of the bill so the Act would not affect any judicial decisions. *Id.* (statements of Rep. Conyers and Clay).

more than that Congress was aware of the unsettled scope of the exemption and that it intended to allow courts to continue to determine the scope of the exemption.[22]

Judge Schiendlin recently reached this correct conclusion in *Laumann*, 56 F. Supp. 3d at 297. Like here, MLB argued that the Curt Flood Act indicated that Congress did not intend the antitrust acts to apply to plaintiffs' claims. *Id.* at 295 n.92. Judge Schiendlin rejected the argument that a report from the Congressional Budget Office supported this result, stating that "a CBO cost estimate is not persuasive evidence of congressional intent." *Id.* at 296. Looking at the text of the Act, she then held that the statute "expressly does not change" the state of the law in any context other than with respect to labor relations with major league players. *Id.* at 296–97.

Since Congress intended to remain neutral, the Act has no application on Judge Patterson's holding in *Postema*. If anything, the neutrality of Congress actually strengthens Plaintiffs' arguments. Indeed, *Postema* issued only a few years before the passage of the Act, so Congress was assumedly aware of the possible application of antitrust laws to employment issues involving umpires. Instead of barring such claims, Congress remained neutral.

In sum, Congress did not acquiesce to a broad exemption but instead chose to allow courts to determine the scope of the exemption in areas outside of player relations. The judiciary created the exemption, and the judiciary should continue to interpret its scope.

### E.  If it chooses, the Court can defer this decision until summary judgment after more facts develop.

The above arguments establish that the alleged conduct falls outside the exemption. If the Court requires further proof, however, then Plaintiffs request that the Court allow the factual record to develop so that Plaintiffs can further demonstrate that the conduct at issue here is not central enough to fall within the exemption.

---

[22] *See* Grow, *supra* note 19, at Part IV ("[O]ne cannot rely on the statute to discern Congressional acquiescence in any one particular view of the scope of baseball's antitrust immunity.").

Relying on *San Jose*, 776 F.3d at 690, Defendants assert that no factual development is needed. *San Jose*, however, was decided in the context of franchise relocation, and it concluded that "few, if any, issues are as central to a sports league's proper functioning as its rules regarding the geographic designation of franchises." *Id.* Again, Plaintiffs have demonstrated that the anticompetitive conduct here is not central to the exhibition of baseball games, and Plaintiffs believe that factual development would further establish this actuality.

## II.   Plaintiffs concede that their FLSA claims extend only to MLB and the Kansas City Royals.

Before Defendants' motion was due, Plaintiffs sent Defendants a letter addressing the portion of Defendants' motion to dismiss concerning the FLSA claims. Plaintiffs confirmed that Mr. Wyckoff brings his FLSA claims only against MLB and the Kansas City Royals, which obviated the need for this portion of Defendants' motion to dismiss. Plaintiffs continued to reserve the right, however, to move for judicial notice and conditional certification for a collective including all MLB scouts jointly employed by MLB (regardless of the franchise) pursuant to 29 U.S.C. § 216(b).

The FLSA portion of Defendants' motion to dismiss is consequently moot.

## CONCLUSION

Defendants have conspired to suppress the labor market for scouting services. The anticompetitive conduct is not central to the business of baseball, and it in no way enhances the viability of the business. Under precedent established for over 40 years since *Flood*, the antitrust exemption does not apply.

Dated: December 4, 2015                            /s/ *Garrett R. Broshuis*

                                                                      **KOREIN TILLERY, LLC**
                                                                      STEPHEN M. TILLERY
                                                                      GARRETT R. BROSHUIS
                                                                      505 N. 7th Street, Suite 3600

St. Louis, MO  63101
stillery@koreintillery.com
gbroshuis@koreintillery.com

**KOREIN TILLERY, LLC**
GEORGE A. ZELCS
205 N. Michigan Ave., Suite 1950
Chicago, IL  60601
gzelcs@koreintillery.com

**SCOTT+SCOTT,**
**ATTORNEYS AT LAW, LLP**
JUDITH S. SCOLNICK
THOMAS K. BOARDMAN
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
jscolnick@scott-scott.com
tboardman@scott-scott.com

**SCOTT+SCOTT,**
**ATTORNEYS AT LAW, LLP**
CHRISTOPHER M. BURKE
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
cburke@scott-scott.com

**BERGER & MONTAGUE, P.C.**
Michael Dell'Angelo (*pro hac vice*)
Sarah Schalman-Bergen (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
SSchalman-Bergen@bm.net
pmadden@bm.net

**WARNER ANGLE HALLAM JACKSON**
**& FORMANEK PLC**
Robert C. Maysey (*pro hac vice* pending)
2555 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 264-7101
rmaysey@warnerangle.com

*Attorneys for Plaintiffs, individually and on behalf of*
*all those similarly situated*

24