UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  09/29/16

JORDAN WYCKOFF, Individually and on
Behalf of All Those Similarly Situated, and
DARWIN COX,

               Plaintiffs,

       - against -

OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated association
doing business as MAJOR LEAGUE
BASEBALL; ALLAN H. SELIG; ROBERT
D. MANFRED, JR.; KANSAS CITY
ROYALS BASEBALL CORP.; MIAMI
MARLINS, L.P.; SAN FRANCISCO
BASEBALL ASSOCIATES LLC; BOSTON
RED SOX BASEBALL CLUB L.P.;
ANGELS BASEBALL LP; CHICAGO
WHITE SOX LTD.; ST. LOUIS
CARDINALS, LLC; COLORADO ROCKIES
BASEBALL CLUB, LTD.; THE BASEBALL
CLUB OF SEATTLE, LLLP; THE
CINCINNATI REDS, LLC; HOUSTON
BASEBALL PARTNERS LLC; ATHLETICS
INVESTMENT GROUP, LLC; ROGERS
BLUE JAYS BASEBALL PARTNERSHIP;
CLEVELAND INDIANS BASEBALL CO.,
L.P.; CLEVELAND INDIANS BASEBALL
CO., INC.; PADRES L.P.; SAN DIEGO
PADRES BASEBALL CLUB, L.P.;
MINNESOTA TWINS, LLC;
WASHINGTON NATIONALS BASEBALL
CLUB, LLC; DETROIT TIGERS, INC.; LOS
ANGELES DODGERS LLC; LOS
ANGELES DODGERS HOLDING
COMPANY LLC; STERLING METS L.P.;
ATLANTA NATIONAL LEAGUE
BASEBALL CLUB, INC.; AZPB L.P.;
BALTIMORE ORIOLES, INC.;
BALTIMORE ORIOLES, L.P.; THE
PHILLIES; PITTSBURGH ASSOCIATES,
L.P.; NEW YORK YANKEES P'SHIP;
TAMPA BAY RAYS BASEBALL LTD.;

**MEMORANDUM
OPINION & ORDER**

15 Civ. 5186 (PGG)

RANGERS BASEBALL EXPRESS, LLC;
RANGERS BASEBALL, LLC; CHICAGO
CUBS BASEBALL CLUB, LLC;
MILWAUKEE BREWERS BASEBALL
CLUB, INC.; MILWAUKEE BREWERS
BASEBALL CLUB, L.P.;

                    Defendants.

PAUL G. GARDEPHE, U.S.D.J.:

      This is a class action suit for antitrust and wage-and-hour violations brought by professional baseball scouts against the current and former Commissioner of Major League Baseball, the Office of the Commissioner, and the clubs that comprise Major League Baseball. Defendants have moved to dismiss the antitrust claims on the grounds that they fall within the baseball exemption to antitrust regulation. Defendants have also moved to dismiss the wage-and-hour claims – except those brought by Plaintiff Jordan Wyckoff against the Office of the Commissioner, the two individual defendants, and the Kansas City Royals – on standing grounds.

## BACKGROUND

### I.    FACTS

      The Second Amended Complaint alleges that the Office of the Commissioner of Baseball – doing business as "Major League Baseball" or the "MLB" – is an unincorporated association comprised of thirty professional baseball clubs (the "Franchises"). (Second Am. Cmplt. ("SAC") (Dkt. No. 109) at ¶ 20)  Major League Baseball operates pursuant to the Major League Constitution, an agreement between the franchise teams.  (Id. at ¶ 83)  Major League Baseball is a large and lucrative organization:  in 2014, MLB's annual revenue was

approximately $9 billion, and more than 75 million baseball fans paid to attend games.  (Id. at ¶¶ 77-78)

### A.   The Role of Professional Baseball Scouts

Each baseball club ("Franchise") employs baseball scouts who observe baseball players across the United States and internationally for the purpose of identifying new talent and assisting the Franchises in making hiring decisions:

> [Scouts] attend baseball games (including, for example, high school games, college games, minor league games, and major league games) and watch players to rate their skills in a variety of categories such as fielding, hitting for power and average, and running.  Scouts also record players' pitching and/or hitting mechanics and develop comprehensive evaluations and projections of players' abilities.  Depending on the type of scout, a scout might evaluate either amateur players, professional players, or both.  But regardless, the basic job duties of the scout are similar.  They assess baseball players and project the players' abilities to perform at the major league level, and they present that information to the Franchises.

(Id. at ¶ 93)

Players are evaluated on a numeric scale, with 20 being the lowest and 80 the highest.  (Id. at ¶ 94)  A score of 50 indicates that a player is performing at a major league level for the category being graded.  (Id.)  To evaluate players, scouts are required to travel domestically and internationally, and at certain times of the year they work long hours.  (Id. at ¶¶ 97-98)

Defendants employ "well over one thousand scouts" and "control all or virtually all of the market for the purchase of baseball scouting services."  (Id. at ¶¶ 92, 125-26)  The information that scouts provide about players "guide[s] the Franchises' decisions on how to rank players to be acquired."  (Id. at ¶ 95)  Because Defendants "place importance on the acquisition

2

and development of baseball players, . . . a scout who is good at evaluating baseball players has great value." (Id. at ¶ 127)

Scouts do not make final decisions about whether to sign players or how much to pay them, however. (Id. at ¶ 95) Accordingly, Plaintiffs argue that "[a]lthough the information (and skills required to present good information) are important and valuable to the Franchises, the information provided by scouts is not directly related to the business of baseball or any revenue stream received by the Franchises or MLB." (Id. at ¶ 96)

B.     **The Uniform Employee Contract**

A scout's employment relationship with a Franchise is governed by a form contract – the "Uniform Employee Contract" – "prescribed by the Commissioner." (Id. at ¶ 100) The Uniform Employee Contract is used for a variety of employees – not just scouts – and incorporates the Major League Rules and the Major League Constitution. (Id.) Under the Uniform Employee Contract, MLB and the Commissioner of Baseball have "'broad powers of control and discipline'" over the employment relationship. (Id.) The employment contracts issued to scouts typically provide for a one year term. (Id. at ¶ 102)

The standard Uniform Employee Contract contains a "Loyalty" provision, which provides that scouts will

a. "serve [the employing Franchise] diligently and faithfully, and . . . observe and comply with all rules and regulations of [the employing Franchise] and the Commissioner."

b. "maintain the confidentiality of all confidential information, including but not limited to scouting information acquired during the [scout's] employment [under the Scout Contract], and . . . preserve such information for the exclusive benefit of [the employing Franchise]."

(<u>Id.</u> at ¶ 105)  When under contract with a Franchise, scouts are prohibited from providing

scouting services to other Franchises.  (<u>Id.</u>)

Major League Rule ("MLR") 3(k) – which is incorporated by reference in all

scouts' employment contracts – states:

> [t]o preserve discipline and competition, and to prevent the enticement of players,
> coaches, managers, and umpires, there shall be no negotiations or dealings
> respecting employment, either present or prospective, between any player, coach
> or manager and any Major or Minor League Club other than the Club with which
> the player is under contract, or acceptance of terms, or by which the player is
> reserved or which has the player on its Negotiation List, or between any umpire
> and any baseball employer with which the umpire is under contract, or acceptance
> of terms, unless the Club or baseball employer with which the person is connected
> shall have, in writing, expressly authorized such negotiations or dealings prior to
> their commencement.

(<u>Id.</u> at ¶ 116)  Although MLR 3(k) does not mention scouts, Defendants apply this rule to scouts.

(<u>Id.</u> at ¶ 117)  Accordingly, a scout working under a one-year employment contract with a

Franchise is generally prohibited from talking with any other Franchise until after that contract

expires, unless the scout receives approval from his Franchise employer.  (<u>Id.</u> at ¶¶ 118-19)

Plaintiffs allege that "[t]he Franchises have a tacit agreement not to permit such discussions

unless the scout is being considered for a promotion."  (<u>Id.</u> at ¶ 119)  Accordingly, this tacit

agreement among the Franchises prevents scouts from making "a horizontal move in a similar

capacity."  (<u>Id.</u>)  Moreover, because scouting positions are not posted openly, scouts do not

generally request permission to pursue opportunities with other Franchises.  (<u>Id.</u> at ¶ 121)

Similarly, a Franchise seeking to hire a scout must wait until that scout is no longer under

contract to initiate contact.  (<u>Id.</u> at ¶ 118)

The Franchises will sometimes enter into agreements that are even more

restrictive than the Uniform Employment Agreement and MLR 3(k).  For example, in 2014,

4

when the San Diego Padres hired a former Texas Rangers executive as their general manager, the Padres agreed that their new general manager "would not poach any employees from the Rangers absent certain pre-designated exceptions." (Id. at ¶ 120)  Plaintiffs also allege that Defendants have agreed to "maintain baseline compensation levels" for various employee categories, such as junior scouts, which keeps compensation artificially low. (Id. at ¶¶ 138-39)

### C.    The Offset Policy

In December 2002, the Labor Relations Unit of the Office of the Commissioner notified Franchise owners and employees, including scouts, of a new policy, referred to as the "Offset Policy." (Id. at ¶ 108)  The Offset Policy is triggered when a scout is dismissed by a Franchise and hired by another Franchise during the term of the scout's one-year employment contract with the original employer. (Id.)  Under the standard scout contract, a scout may be terminated upon ten days' notice, but the Franchise must pay the scout's salary for the full one-year term of the employment contract. (Id. at ¶ 107)  The Offset Policy requires that where a scout is re-hired while being paid under an earlier employment contract, the hiring Franchise must obtain that earlier contract from the scout. (Id. at ¶ 108)  "The amount of any compensation due to the scout [under the original contract] is then reduced by the amount paid to the scout by the hiring Franchise." (Id.)

The Offset Policy also requires that the scout and the hiring Franchise negotiate the scout's compensation in good faith. (Id. at ¶ 109)  A dismissing Franchise may object that a hiring Franchise is offering unreasonably low compensation, in which case

MLB will investigate and determine whether the scout is being paid a "reasonable" rate based on:

a.   the scout's experience, past accomplishments, and compensation history;

5

b.  the scout's compensation with the dismissing Franchise;

c.  compensation normally paid by the hiring Franchise to employees of similar experience and accomplishments in the position for which the employee was hired;

d.  compensation paid by other Franchises to employees in similar positions to the one for which the employee was hired;

e.  background of the negotiations between the employee and the hiring Franchise; and

f.  any other pertinent considerations.

(Id.)  Where the Commissioner determines that the compensation paid by the hiring Franchise is too low, the Commissioner may direct the hiring Franchise to re-contract at a fair and reasonable level of compensation.  (Id. at ¶ 110)  Plaintiffs allege that the Offset Policy is a disincentive for Franchises to hire a dismissed scout.  (Id. at ¶ 112)  They argue that, "[a]bsent [the] Offset Policy, dismissed scouts could more easily negotiate agreements with new Franchises and receive higher compensation including both wages owed by the dismissing Franchise and the hiring Franchise."  (Id. at ¶ 111)

**D.  Plaintiffs' Employment with MLB**

Plaintiffs Jordan Wyckoff and Darwin Cox are former Major League Baseball scouts.  (Id. at ¶¶ 18-19)  Plaintiff Wyckoff signed a Uniform Employee Contract with the Kansas City Royals on October 31, 2012.  (Id. at ¶ 145)  That contract expired on October 31, 2013.  (Id.)  Wyckoff was responsible for scouting players in the Northeast United States.  (Id. at ¶ 146)  He worked throughout the year, but his busiest period was between January and June. (Id. at ¶ 148)  Wyckoff traveled to a number of states to attend practices, games, and showcases, and he "often worked in excess of forty hours per week."  (Id. at ¶¶ 148-49)  Wyckoff was paid a

salary of only $15,000 per year, however, and he did not receive any overtime compensation. (Id. at ¶¶ 147, 149)

When Wyckoff's contract expired in October 2013, it was not renewed.  (Id. at ¶ 156)  At that point, there were "very few" scouting positions available with other Franchises, because the other Franchises had already completed most of their hiring.  (Id.)  Accordingly, Wyckoff was not able to secure a scouting position with another Franchise.  (Id.)

Plaintiff Cox worked as a Scouting Supervisor for the Colorado Rockies for twenty years, from 1991 to 2011.  (Id. at ¶ 159)  He was assigned to North Texas, Oklahoma, and Kansas, and his salary in 2011 was $63,500.  (Id. at ¶¶ 160-61)  His contract was not renewed after it expired in 2011.  (Id. at ¶ 163)

## II.   **PROCEDURAL HISTORY**

Plaintiff Wyckoff filed this action on behalf of himself and a class of MLB scouts on July 2, 2015.  The Complaint asserts antitrust violations under the Sherman Act and New York's Donnelly Act, and minimum wage, overtime, and recordkeeping violations under the Fair Labor Standards Act ("FLSA").  (Dkt. No. 43)  Wyckoff filed an Amended Complaint on September 22, 2015 (Dkt. No. 101), and a Second Amended Complaint on October 20, 2015.  Darwin Cox is added as a plaintiff in the SAC.  (Dkt. No. 109)

Defendants have moved to dismiss Plaintiffs' antitrust claims and all FLSA claims against Franchises other than the Kansas City Royals, Wyckoff's former employer.  (Dkt. No. 120)

## DISCUSSION

### I.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

### II.   SHERMAN ACT CLAIMS

#### A.   Applicable Law

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[.]" "[S]tating a claim under Section 1 of the Sherman Act 'requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.'" Meyer v. Kalanick, 15 Civ. 9796, 2016 WL 1266801, at *1 (S.D.N.Y. Mar. 31, 2016) (quoting Twombly, 550 U.S. at 556).

8

Since 1922, however, federal courts have recognized an exemption from antitrust regulation for the business of baseball.  See Fed. Baseball Club of Balt. v. Nat'l League of Prof'l Baseball Clubs, 259 U.S. 200, 208-09 (1922).  In Federal Baseball, plaintiffs challenged the National League and American League's practice of buying clubs in smaller leagues and "inducing all those clubs . . . to leave their League."  Id. at 207.  Plaintiffs claimed that this practice was anti-competitive and violated the Sherman Act.  Id.  Justice Holmes, writing for a unanimous court, rejected this argument, holding that "giving exhibitions of base[]ball" was a "purely state affair[]" not subject to regulation by the federal government.  Id. at 208.  The Supreme Court reaffirmed this decision in Toolson v. New York Yankees, Inc., 346 U.S. 356, 357 (1953) (per curiam), in which MLB players challenged the "enforcement of the standard 'reserve clause' in their contracts[,] pursuant to nationwide agreements among the [MLB] defendants."  Toolson, 346 U.S. at 362 (Burton, J., dissenting).  In a one-paragraph per curiam opinion, the Court declined to "re-examin[e] . . . the underlying issues" of Federal Baseball and placed the onus for clarifying that professional baseball was subject to antitrust regulation squarely on Congress's doorstep.  Id. at 357 ("We think that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation.").

The Second Circuit addressed the baseball exemption in 1970, in Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003 (2d Cir. 1970) (Friendly, J.).  In Salerno, umpires brought claims against the American League for antitrust violations, claiming that they had been fired in retaliation for attempting to organize umpires into a collective bargaining unit.  Salerno, 429 F.2d at 1004.  The Second Circuit held that the umpires' claim was barred by the baseball exemption.  Id. at 1004-05.  While the Second Circuit "acknowledge[d] . . . that Federal Baseball was not one of Mr. Justice Holmes' happiest days," and that "the rationale

9

of <u>Toolson</u> is extremely dubious," the court concluded that it was bound by the exemption defined in those cases.[1] <u>Id.</u> at 1005.

The baseball exemption returned to the Supreme Court in 1972, in <u>Flood v. Kuhn</u>, 407 U.S. 258 (1972). Curt Flood had been a star player for the St. Louis Cardinals until he was traded to the Philadelphia Phillies in 1969. <u>Flood</u>, 407 U.S. at 264-65. Flood had not been consulted about the trade, and he brought an antitrust claim challenging MLB's reserve system, under which a player is contracted to play with a certain team and that team holds the unilateral right to reassign the player's contract to another team if it so chooses.[2] <u>Id.</u> at 265. The Court reviewed the history of antitrust regulation as applied to professional sports in the years since <u>Federal Baseball</u> and concluded that the baseball exemption from the antitrust laws is "an exception and an anomaly," and that "<u>Federal Baseball</u> and <u>Toolson</u> have become an aberration confined to baseball." <u>Id.</u> at 282.

The Court noted, however, that that

> aberration is an established one, and one that has been recognized not only in <u>Federal Baseball</u> and <u>Toolson</u>, but in . . . a total of five consecutive cases in this Court. It is an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of <u>stare decisis</u>, and one that has survived the Court's expanding concept of interstate commerce. It rests on a recognition and an acceptance of baseball's unique characteristics and needs.

<u>Id</u>.

The Court further noted that

_____

[1] Judge Friendly presciently observed that "[w]hile we should not fall out of our chairs with surprise at the news that <u>Federal Baseball</u> and <u>Toolson</u> had been overruled, we are not at all certain that the Court is ready to give them a happy despatch." <u>Salerno</u>, 429 F.2d at 1005.

[2] The essence of the reserve system is "the confinement of the player to the club that has him under contract; the assignability of the player's contract; and the ability of the club annually to renew the contract unilaterally, subject to a stated minimum." <u>Flood</u>, 407 U.S. at 259 n.1.

since 1922[,] baseball, with full and continuing congressional awareness has been allowed to develop and to expand unhindered by federal legislative action. Remedial legislation has been introduced repeatedly in Congress but none has ever been enacted. The Court, accordingly, has concluded that Congress as yet has had no intention to subject baseball's reserve system to the reach of the antitrust statutes."

Id. at 283.

Although concluding that "[p]rofessional baseball is a business [that] is engaged in interstate commerce" (id. at 282) – contrary to Justice Holmes' ruling in Federal Baseball that professional baseball games are "purely state affairs," Federal Baseball, 259 U.S. at 208 – the Court rejected Flood's antitrust claims and reaffirmed the antitrust exemption for baseball set forth in Federal Baseball and confirmed in Toolson:

> We continue to be loath, 50 years after Federal Baseball and almost two decades after Toolson, to overturn those cases judicially when Congress, by its positive inaction, has allowed those decisions to stand for so long and, far beyond mere inference and implication, has clearly evinced a desire not to disapprove them legislatively.
>
> Accordingly, we adhere once again to Federal Baseball and Toolson and to their application to professional baseball. . . . If there is any inconsistency or illogic in all this, it is an inconsistency and illogic of long standing that is to be remedied by the Congress and not by this Court.

Id. at 283-84.

In 1998, Congress passed the Curt Flood Act, which creates an exception to baseball's exemption from the antitrust laws for major league baseball players. 15 U.S.C. § 26b (2002). Subsection (a) of the Act provides that

> the conduct, acts, practices, or agreements of persons in the business of organized major league baseball directly relating to or affecting employment of major league baseball players to play baseball at the major league level are subject to the antitrust laws to the same extent such conduct, practices, or agreements would be subject to the antitrust laws if engaged in by persons in any other professional sports business affecting interstate commerce.

15 U.S.C. § 26b(a).

11

Other provisions in the Curt Flood Act make explicit that the exception embodied in the Act applies only to major league baseball players, and not to others "employed in the business of organized professional baseball":

> No court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any conduct, acts, practices, or agreements other than those set forth in subsection (a) of this section. This section does not create, permit or imply a cause of action by which to challenge under the antitrust laws, or otherwise apply the antitrust laws to, any conduct, acts, practices, or agreements that do not directly relate to or affect employment of major league baseball players to play baseball at the major league level, including but not limited to
>
> (1) any conduct, acts, practices, or agreements of persons engaging in, conducting or participating in the business of organized professional baseball relating to or affecting employment to play baseball at the minor league level, any organized professional baseball amateur or first-year player draft, or any reserve clause as applied to minor league players . . . [or]
>
> . . .
>
> (5) the relationship between persons in the business of organized professional baseball and umpires or other persons who are employed in the business of organized professional baseball by such persons. . . .

15 U.S.C. § 26b(b). The Act further provides that "[o]nly a major league baseball player has standing to sue under this section." 15 U.S.C. § 26b(c).

**B.**     **Post-*Flood v. Kuhn* Treatment of the Baseball Exemption**

Since Flood v. Kuhn, lower courts have disagreed about the scope of the baseball exemption. Some courts have interpreted the exemption broadly, finding that it encompasses the entire "business of baseball, not any particular facet of that business, from the federal antitrust laws." See, e.g., Charles O. Finley & Co. v. Kuhn, 569 F.2d 527, 541 (7th Cir. 1978) (finding that the baseball exemption barred antitrust challenge to Commissioner's rejection of certain player trades as "not in the best interests of baseball"). Under these decisions, the only activities

that are subject to antitrust liability are those that are "wholly collateral to the public display of baseball games[.]" City of San Jose v. Office of the Commissioner of Baseball, 776 F.3d 686, 690 (9th Cir. 2015) (applying the baseball exemption to antitrust challenge to franchise relocation). Other courts have concluded that the baseball antitrust exemption is "limited to the reserve clause" that was challenged in Flood. See Piazza v. Major League Baseball, 831 F. Supp. 420, 438, 440-41 (E.D.Pa. 1993) (antitrust exemption is limited to baseball's reserve system; exemption did not require dismissal of plaintiffs' antitrust claim challenging MLB's rejection of plaintiffs' effort to purchase and relocate the San Francisco Giants to Tampa); see also Butterworth v. Nat'l League of Prof. Baseball Clubs, 644 So.2d 1021, 1023-24 (Fla. 1994) (following Piazza and finding that franchise relocation determinations are not exempt from antitrust regulation).

Citing Postema v. National League of Professional Baseball Clubs, 799 F. Supp. 1475, 1488 (S.D.N.Y. 1992), rev'd on other grounds, 998 F.2d 60 (2d Cir. 1993), Plaintiffs here argue that baseball's antitrust exemption applies only to claims challenging (1) the reserve system or (2) "league structure." (Pltf. Opp. Br. (Dkt. No. 123) at 12-17)

In Postema, a female umpire sued the American and National Professional Baseball Leagues, alleging discrimination in violation of Title VII and the New York State Human Rights Law, and common law restraint of trade. Postema, 799 F. Supp. at 1478-90. Defendants moved to dismiss plaintiff's restraint of trade claims, "arguing that the[se] claims are preempted by baseball's exemption to antitrust law." Id. at 1486.

In considering the motion to dismiss, the court noted that any application of Federal Baseball, Toolson, and Flood must take account of the context in which they arose:

> Because the <u>Federal Baseball</u>, <u>Toolson</u>, and <u>Flood</u> cases considered the baseball exemption in very limited contexts, <u>i.e.</u> with regard to baseball's reserve clause and to its league structure, those opinions give little guidance in determining the breadth of baseball's immunity to antitrust liability.  The Court has not specifically determined whether the exemption applies to baseball's conduct outside the domain of league structure and player relations.  However, the <u>Flood</u> Court stated that the immunity "rests on a recognition and acceptance of baseball's unique characteristics and needs," suggesting that baseball might not be exempt from liability for conduct not touching on those characteristics or needs.

(<u>Id</u>. at 1488 (citing <u>Flood</u>, 407 U.S. at 282).

After reviewing a number of decisions in which the antitrust laws had been applied to garden-variety commercial agreements between baseball entities and third parties (<u>see id.</u> at 1488-89), the court concluded that baseball does not enjoy blanket immunity from the application of those laws, and that "baseball may be subject to antitrust liability for conduct unrelated to the reserve system or to league structure":

> It is thus clear that although the baseball exemption does immunize baseball from antitrust challenges to its league structure and its reserve system, the exemption does not provide baseball with blanket immunity for anti-competitive behavior in every context in which it operates.  The Court must therefore determine whether baseball's employment relations with its umpires are "central enough to baseball to be encompassed in the baseball exemption."

(<u>Id</u>.) (quoting <u>Henderson Broadcasting Corp. v. Houston Sports Ass'n</u>, 541 F. Supp. 263, 265 (S.D. Tex. 1982) (finding that exemption did not immunize owner of Houston Astros from suit brought by a radio station; "broadcasting is not central enough to baseball to be encompassed in the baseball exemption").

The <u>Postema</u> court went on to deny the baseball defendants' motion to dismiss, finding that they had "not shown any reason why the baseball exemption should apply to baseball's employment relations with its umpires":

14

> Unlike the league structure or the reserve system, baseball's relations with non-players are not a unique characteristic or need of the game. Anti-competitive conduct toward umpires is not an essential part of baseball and in no way enhances its vitality or viability.
>
> Accordingly, because the baseball exemption does not encompass umpire employment relations, application of New York's common law of restraint of trade presents no conflict with the baseball exemption, and Plaintiff's claims are not preempted.

(Id. at 1489)

One other court in this District has concluded that Flood narrowed the scope of the baseball exemption. In Laumann v. National Hockey League, 56 F. Supp. 3d 280 (S.D.N.Y. 2014), plaintiffs brought antitrust challenges against, inter alia, the National Hockey League, MLB, several professional baseball and hockey clubs, broadcasters, and distributors concerning the broadcasting of professional baseball and hockey games, alleging that a territorial broadcasting system agreement entered into by defendants violated Sections 1 and 2 of the Sherman Act. Laumann, 56 F. Supp. 3d at 285. The baseball defendants moved for summary judgment, arguing that plaintiffs' antitrust claims against them were barred by the baseball exemption. Id. at 286.

The Laumann court denied defendants' motion, stating that "[t]he continued viability and scope of the baseball exemption are far from clear." Id. at 295. The court asserted that "Flood replaced Federal Baseball's and Toolson's holdings based on interstate commerce with a limited holding based only on stare decisis and inferred congressional intent." Id. Relying on Henderson Broadcasting Corp., 541 F. Supp. at 265, the Laumann court found that

the exemption did not apply to MLB's contracts for broadcasting rights, because that "subject . . . is not central to the business of baseball." Id. at 296-97.[3]

C.    **Analysis**

Plaintiffs argue that this Court should interpret the baseball exemption to encompass only "league structure and player contracts (related to the reserve system)," because the cases that have applied the baseball exemption to bar an antitrust claim since Flood involve only claims in one of those two categories.  (Pltf. Opp. Br. (Dkt. No. 123) at 12-13)

As an initial matter, the premise for Plaintiffs' argument is incorrect.  In Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC, 87 F. Supp. 3d 874, 881-82, 884-85 (N.D. Ill. 2015), for example, the Northern District of Illinois applied the baseball exemption to allegedly anti-competitive activity that does not fall within either of Plaintiffs' two categories.  In that case, the court denied plaintiffs' application for a preliminary injunction on the grounds that the baseball exemption barred a challenge to the Chicago Cubs' alleged agreement with others to sell tickets to watch Cubs games from rooftops overlooking Wrigley Field. Id. at 884-85.  In denying plaintiff's application, the court concluded that the leading Supreme Court cases broadly exempt the "business of baseball" – not discrete aspects of that business – from antitrust regulation. Id.

---

[3] The Laumann court also relied on the Sports Broadcasting Act ("SBA"), 15 U.S.C. § 1291, "which created an antitrust exemption for certain types of professional sports broadcasting agreements, particularly league-wide contracts for over-the-air broadcasts." Laumann, 56 F. Supp. 3d at 293.  The court found that Congress's passage of this statute in 1961 indicates that "Congress understood sports broadcasting agreements to fall outside the baseball exemption. The provision of the SBA granting limited immunity to a narrow category of broadcasting agreements would be meaningless if all baseball broadcasting agreements were already covered by the common law exemption." Id. at 295 (emphasis in original).

In any event, this Court is not persuaded that Flood announces a narrowing of the holdings in Federal Baseball and Toolson.  To the contrary, the message of Flood is that any "judicial overturning of Federal Baseball" would lead to such "confusion and . . . retroactivity problems" that, "if any change is to be made, it [should] come by legislative action."  Flood, 407 U.S. at 283.  The Flood court also goes out of its way to emphasize that it has not modified the holdings in Federal Baseball and Toolson:

> . . .we adhere once again to Federal Baseball and Toolson and to their application to professional baseball.
> . . . .
> We repeat for this case what was said in Toolson:
>
> "Without re-examination of the underlying issues, the (judgment) below (is) affirmed on the authority of Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs, supra, so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."

Id. at 284-85 (quoting Toolson, 346 U.S. at 357).  Given the Flood court's treatment of Federal Baseball and Toolson, it cannot be credibly argued that Flood announces a significant narrowing of the earlier decisions.

As the Ninth Circuit has explained,

> Flood's stare decisis and congressional acquiescence rationales suggest the Court intended the exemption to have the same scope as the exemption established in Federal Baseball and Toolson.  After all, it would make little sense for Flood to have contracted (or expanded) the exemption from the one established in the cases in which Congress acquiesced and which generated reliance interests.  And Federal Baseball and Toolson clearly extend the baseball exemption to the entire "business of providing public baseball games for profit between clubs of professional baseball players."

City of San Jose, 776 F.3d at 690.  This Court finds this reasoning fully persuasive.

Separate and apart from Supreme Court jurisprudence, this Court is bound, of course, by the Second Circuit's determination that Federal Baseball and Toolson hold that

"professional baseball is not subject to the antitrust laws." Salerno, 429 F.2d at 1005. Nothing in Flood suggests that that broad pronouncement may now be safely ignored by lower courts.

Finally, even if Flood could somehow be read as narrowing the broad language of Federal Baseball and Toolson, the instant case requires no fine analysis to determine whether the activity in question is central to the "business of baseball" or, rather, is "'incidental . . .' to the business of baseball," Right Field Rooftops, LLC, 87 F. Supp. 3d at 885, and "wholly collateral to the public display of baseball games." City of San Jose, 776 F.3d at 690.

The employment relationship between baseball scouts and Franchises is central to the "business of baseball." Scouts play a critical role in directing talent to the Franchises, and the quality of the players is largely what determines success on the field as well as success in the "business of baseball." Because scouts' work has a direct and critical effect on the selection of players who will participate in the games that the public will watch, their role cannot be characterized as "wholly collateral" or "incidental" to the business of professional baseball.

Plaintiffs' allegations in the Second Amended Complaint confirm all of these points. In the SAC, Plaintiffs allege that their jobs have "great value" because of the "importance" that the Franchises place "on the acquisition and development of baseball players." (SAC (Dkt. No. 109) at ¶ 127) According to the SAC, scouts are the primary mechanism by which professional baseball teams acquire information about potential players and evaluate their skills in order to make hiring decisions. (See id. at ¶¶ 94-95, 127) Scouts thus play a crucial role in determining which teams will acquire which players. And according to the SAC, scouts' expertise is unique to the field of professional baseball. Indeed, Plaintiffs allege that their expertise and work is so extraordinarily unique to the field of professional baseball that the MLB controls "virtually all" scout employment, and comparable positions do not exist internationally

18

or in the context of college baseball.  (Id. at ¶¶ 125-26)  In sum, it is clear from the allegations of the SAC that scouts' identification and targeting of particular players greatly influences the Franchises' decisions about which players to hire and what team to field.  Their duties – and the Franchises' employment relationships with these critical components of the highly competitive player acquisition effort – are thus an integral part of the "business of baseball."  See Charles O. Finley & Co., 569 F.2d at 534-35, 541 (barring antitrust challenge to Commissioner's authority to reject player trades; "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws"); Miranda v. Selig, Case No. 14-cv-05349-HSG, 2015 WL 5357854, at *2 (N.D.Ca. Sept. 14, 2015) (finding that "restrictions on the pay and mobility of minor league baseball players" fall within the baseball exemption, "which applies broadly to the 'business of providing public baseball games for profit between clubs of professional baseball players'").

While Plaintiffs argue that scouts – in performing their duties – frequently attend amateur practices and games, and that scouts are not "on-field personnel" during professional baseball games (Pltf. Opp. Br. (Dkt. No. 123) at 19-22), these points are irrelevant.  The "business of baseball" is not limited solely to the players who appear on the field.  Moreover, as Plaintiffs allege in the SAC, scouts' evaluations from amateur events "guide" Franchises' hiring decisions.  (SAC (Dkt. No. 109) at ¶ 95)  Like spring training, scouts' attendance at amateur events is an off-field action that serves to improve the quality of Franchise games, which is why professional baseball teams pay scouts to attend such events and identify promising players.

For all of these reasons, Defendants' motion to dismiss Plaintiffs' Sherman Act claims will be granted.

## III.   <u>STATE LAW ANTITRUST CLAIMS</u>

Plaintiffs have also alleged claims under the Donnelly Act, New York's antitrust statute.  "Baseball is an exception to the normal rule that 'federal antitrust laws [] supplement, not displace, state antitrust remedies.'"  <u>City of San Jose</u>, 776 F.3d at 691 (quoting <u>California v. ARC Am. Corp.</u>, 490 U.S. 93, 102 (1989)).  The "normal rule" does not apply because the baseball exemption does more than create a "gap" in federal antitrust regulations; it "establishes a universal exemption in the name of uniformity," thus preempting any contrary state regulation.  <u>Major League Baseball v. Crist</u>, 331 F.3d 1177, 1186 (11th Cir. 2003); <u>see also</u> <u>Flood</u>, 407 U.S. at 284 (affirming lower court decision finding that "'state antitrust regulation would conflict with federal policy'" and rejecting state law antitrust claim).

Accordingly, Defendants' motion to dismiss Plaintiffs' state law antitrust claims will be granted.

## IV.   <u>WAGE-AND-HOUR CLAIMS</u>

Defendants have moved to dismiss Plaintiff Wyckoff's wage and hour claims against all Franchise Defendants other than the Kansas City Royals.[4]  Plaintiffs do not address Defendants' legal arguments, but instead state that "Wyckoff brings his FLSA claims only against MLB and the Kansas City Royals[.]"  (Pltf. Opp. Br. (Dkt. No. 123) at 27)

"In a proposed class action, 'the named class plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"  <u>McCall v. Chesapeake Energy Corp.</u>, 817 F. Supp. 2d 307, 313 (S.D.N.Y. 2011) (quoting <u>Central States</u>

---

[4]  Plaintiff Cox has not brought a wage-and-hour claim against the Colorado Rockies, his former employer, or against any other Franchise Defendant.

Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181, 199 (2d Cir. 2005)).  Here, the SAC does not allege that Wyckoff – the only plaintiff who brings a claim under the FLSA – was personally injured by any Franchise Defendant other than the Kansas City Royals.  Accordingly, Wyckoff may not pursue FLSA claims against other Franchise Defendants.  Nor may FLSA claims against Franchise Defendants other than the Kansas City Royals be maintained on behalf of as-yet-unidentified class members. "'That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"' Lewis v. Casey, 518 U.S. 343, 357 (1996) (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 40 n.20 (1976)).

Accordingly, the SAC's FLSA claims will be dismissed, except as to the Kansas City Royals.

## CONCLUSION

Defendants' motion to dismiss Plaintiffs' Sherman Act and Donnelly Act claims is granted.  Plaintiff Wyckoff's claims under the Fair Labor Standards Act are dismissed as to all Defendants other than the Kansas City Royals.  The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 120, 127).

It is further ORDERED that there will be a conference in this matter on **October 27, 2016 at 11:00 a.m.**  The parties are directed to file a proposed Case Management Plan and Scheduling Order with this Court by **October 20, 2016**.

Dated: New York, New York
       September 29, 2016

SO ORDERED.

Paul G. Gardephe
United States District Judge